UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

JUN 17 2025

CLERK U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| | ) |
| v. | )    Case No. 2:25po2 |
| | ) |
| ART W. BLOW, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

Defendant Art W. Blow ("Blow") is charged with failing to adhere to state hunting regulations when hunting on a National Wildlife Refuge in violation of 50 C.F.R. § 32.2(d) and 16 U.S.C. § 668dd(f)(2). ECF No. 1. The United States of America ("the Government") alleges that Blow killed a female bear accompanied by a cub in violation of Title 4, Virginia Administrative Code § 15-50-60, while hunting in the Great Dismal Swamp National Wildlife Refuge. *Id.* The federal regulation Blow allegedly violated prohibits hunters from violating any applicable state statute or regulation while hunting on a national wildlife refuge. 50 C.F.R. § 32.2(d). The federal statute, 16 U.S.C. § 668dd(f)(2) provides the penalty for violating 50 C.F.R. § 32.2(d). Thus, Blow is charged with violating a state regulation, a federal regulation, and a federal statute in this single offense.

The Court held a bench trial on April 22, 2025. ECF No. 8. At trial, Blow argued that Title 4, Virginia Administrative Code § 15-50-60 does not create a strict liability offense[1], so the

---

[1] "An offense for which the action alone is enough to warrant a conviction, with no need to prove a mental state; specif., a crime that does not require a mens rea element, such as traffic offenses and illegal sales of intoxicating liquor." *Crime*, Black's Law Dictionary (12th ed. 2024).

Government could not convict him without proving beyond a reasonable doubt that he acted knowingly or recklessly when he allegedly killed a female bear accompanied by a cub. The Court took the strict liability issue under advisement, and the parties submitted briefs addressing that issue. See ECF Nos. 10, 11.

The Court has considered the evidence and arguments of the parties. For the reasons that follow, the Court finds Defendant Blow **GUILTY** of violating Title 4, Virginia Administrative Code § 15-50-60, 16 U.S.C. § 668dd(f)(2) and 50 C.F.R. § 32.2(d).

## I. <u>CONCLUSIONS OF LAW</u>

The Court begins with a discussion of the arguments the parties raised in their briefs before explaining its finding of facts and verdict. Blow presents three arguments in his brief. ECF No. 10. First, Blow argues that 16 U.S.C. § 668dd(f)(2) does not apply to this case, even though that statute is listed on his original citation and he is charged with violating it. *Id.* at 5; ECF No. 1 at 1. Second, he argues that 16 U.S.C. § 668dd(f)(2) "does not create a strict liability offense." ECF No. 10 at 7. Third, Blow argues that the Virginia hunting regulation he is alleged to have violated, Title 4, Virginia Administrative Code § 15-50-60, does not create a strict liability offense. ECF No. 10 at 2. The Court addresses each argument in turn.

### A. 16 U.S.C. § 668dd(f)(2) applies to this case.

The Government alleges that Blow violated Title 4, Virginia Administrative Code § 15-50-60—and consequently 50 C.F.R. § 32.2(d) and 16 U.S.C. § 668dd(f)(2)—while hunting in the Great Dismal Swamp National Wildlife Refuge. ECF No. 1 at 1. Blow's first argument pertains to how federal and state laws interact in the management of the National Wildlife Refuge System, so the Court will explain that interaction before addressing his argument.

2

    *1. 16 U.S.C. §§ 668dd–668ee and 50 C.F.R. § 32.2 regulate hunting on national wildlife refuges.*

The Property Clause of the United States Constitution gives Congress the authority to "make all needful Rules and Regulations respecting the territory or other Property belonging to the United States . . . " U.S. Const. art. IV, § 3, cl. 2. This includes the land contained within the National Wildlife Refuge System. *See Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 557–58 (9th Cir. 2019).

The statutes that govern the management of the National Wildlife Refuge System are codified at 16 U.S.C. § 668dd–668ee. The Secretary of the Interior, through the United States Fish and Wildlife Service ("Fish and Wildlife Service"), manages the National Wildlife Refuge System. 16 U.S.C. § 668dd(a)(1). Congress specifically authorized the Fish and Wildlife Service to "[i]ssue regulations," § 668dd(b)(5), to carry out the National Wildlife Refuge System Administration Act of 1966, Pub. L. No. 89-669, 80 Stat. 926 (codified as amended at 16 U.S.C. § 668dd–668ee (1998)), the National Wildlife Refuge System Improvement Act of 1997, Pub. L. No. 105-57, 111 Stat. 1252 (codified as amended at 16 U.S.C. § 668dd–668ee (1998)), and the National Wildlife Refuge System Improvement Act of 1998, Pub. L. No. 105-57, 111 Stat. 1254 (codified as amended at 16 U.S.C. § 668dd–668ee (1998)). *See Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, 539 F. Supp. 3d 543, 558 (D.S.C. 2021) (quoting § 668dd(b)(5)) ("Congress tasked the [Fish and Wildlife Service] with the management of the National Wildlife Refuge System under the Refuge Improvement Act, and Section (b)(5) of that Act permits the [Fish and Wildlife Service] to '"issue regulations to carry out the Act."'").

Although the federal government owns and controls the land that houses national wildlife refuges, states still "possess broad powers over fish and wildlife within their borders." *Ctr. for Biological Diversity*, 946 F.3d at 558 (citing 16 U.S.C. § 668dd(m)). Section 668dd(m) states that:

> Nothing in this Act shall be construed as affecting the authority, jurisdiction, or responsibility of the several states to manage, control, or regulate fish and resident wildlife under State law or regulations in any area within the system. Regulations permitting hunting and fishing of fish and resident wildlife within the system shall be, to the extent practicable, consistent with State fish and wildlife laws, regulations, and management plans.

16 U.S.C. § 668dd(m). The regulations promulgated by the Fish and Wildlife Service to manage the National Wildlife Refuge System recognize that both state and federal laws and regulations apply to hunting on national wildlife refuges. 50 C.F.R. § 32.2(d) ("Each person shall comply with the applicable provisions of the laws and regulations of the State wherein any area is located unless further restricted by Federal law or regulation.").[2] Therefore, a state's laws for managing wildlife apply to the national wildlife refuges located in that state unless they are specifically preempted by federal law. *Ctr. for Biological Diversity*, 946 F.3d at 558 (citing *Kleppe v. New Mexico*, 426 U.S. 529, 542–43 (1976)). This means that 50 C.F.R. § 32.2(d) effectively incorporates the "applicable provisions"[3] of state laws and regulations like Title 4, Virginia Administrative Code § 15-50-60, and therefore requires that hunters on national wildlife refuges comply with state regulations.

50 C.F.R. § 32.2(d) is a regulation issued pursuant to the authority Congress granted the Fish and Wildlife Service in 16 U.S.C. § 668dd(b)(5); it lists 16 U.S.C. § 668dd–668ee as authority supporting its promulgation, and other courts have applied the 16 U.S.C. § 668dd(f) penalty structure to violations of other sections of 50 C.F.R. § 32.2. *See United States v. Speener*, No. 2:22-MJ-1031, 2024 WL 1404334, at *1 (E.D.N.C. Apr. 1, 2024) (noting that the Government

---

[2] Courts have held that the Government may constitutionally issue regulations like 50 C.F.R. § 32.2(d) pursuant to the Property Clause. *See United States v. Bohn*, 622 F.3d 1129, 1133–35 (9th Cir. 2010) (discussing 36 C.F.R. § 4.2(b), which prohibits violations of state traffic law and adopts state traffic law as part of the federal regulations governing national parks and national recreation areas).

[3] Blow does not dispute that Title 4, Virginia Administrative Code § 15-50-60 is an "applicable provision" to hunting on a National Wildlife Refuge.

4

charged the defendant with violating both 16 U.S.C. § 668dd and 50 C.F.R. 32.2(h) for distributing

bait and hunting over bait).    Section 668dd(f) sets forth the following penalties for violating

§ 668dd and the regulations issued pursuant to that statute:

> (f) Penalties
>
>> (1) Knowing violations
>> Any person who knowingly violates or fails to comply with any of the
>> provisions of this Act or any regulations issued thereunder shall be fined
>> under Title 18 or imprisoned for not more than 1 year, or both.
>>
>> (2) Other violations
>> Any person who otherwise violates or fails to comply with any of the
>> provisions of this Act (including a regulation issued under this Act) shall be
>> fined under Title 18 or imprisoned not more than 180 days, or both.

§ 668dd(f)(1)–(2).    Considering this background of intertwined state and federal authority, the fact

that the Government charged Blow with violating 16 U.S.C. § 668dd(f)(2) and 50 C.F.R. § 32.2(d)

because he violated Title 4, Virginia Administrative Code § 15-50-60 is understandable.    In sum,

§ 668dd gives the Fish and Wildlife Service authority to manage the National Wildlife Refuge

System, specifically by promulgating regulations. § 668dd(b)(5).    One of the regulations

promulgated pursuant to that statute, 50 C.F.R. § 32.2(d), requires that "each person shall comply

with the applicable provisions of the laws and regulations of the State wherein any area is located

unless further restricted by Federal law or regulation." A state hunting regulation, Title 4, Virginia

Administrative Code § 15-50-60, states that "it shall be unlawful to take or kill a female bear

accompanied by a cub." So a hunter who kills a female bear accompanied by a cub violates Title

4, Virginia Administrative Code § 15-50-60, a state hunting regulation. An individual who violates

a state regulation while hunting on a national wildlife refuge necessarily violates 50 C.F.R.

§ 32.2(d), which requires that hunters on a national wildlife refuge comply with "the applicable

provisions of the laws and regulations of the State wherein any area is located." And § 668dd(f)

provides specific penalties for an individual who violates § 668dd "*including a regulation issued under this Act,*" such as 50 C.F.R. § 32.2(d). 16 U.S.C. § 668dd(f)(2) (emphasis added).

Blow argues that this framework does not apply to his case because 16 U.S.C. § 668dd(f)(2) "does not in any way create an offense by which [he] is charged or could be charged." ECF No. 10 at 5.[4] Instead, he claims the regulation of bear hunting "is left solely to the state, and the statute does not incorporate the laws and regulations of the states and impose specific penalties." *Id.* Blow argues that § 668dd preserves the states' jurisdiction over wildlife management and merely "encourages federal regulations to attempt to be consistent with state regulation." *Id.* at 6. In short, Blow argues that he cannot be charged with violating 16 U.S.C. § 668dd(f)(2) because that statute neither adopts state regulations nor makes killing a female bear accompanied by a cub a federal crime.

Blow recognizes a few important details, but his argument ignores the overall statutory and regulatory scheme that applies to the management of the National Wildlife Refuge System. He correctly points out that state wildlife management laws and regulations apply to individuals who hunt on national wildlife refuges. ECF No. 10 at 6. And indeed, 16 U.S.C. § 668dd(m) encourages the Fish and Wildlife Service to make the regulations it promulgates to manage the National Wildlife Refuge System to be consistent with state laws. But this does not mean that federal law, specifically § 668dd, is wholly inapplicable when it comes to regulating hunting on a national wildlife refuge. Although no federal regulation or statute explicitly makes killing a female bear accompanied by a cub a criminal offense, 50 C.F.R. § 32.2(d) requires that a person hunting on a national wildlife refuge comply with "the applicable provisions of the laws and regulations of the

---

[4] The Government did not respond to Blow's argument that 16 U.S.C. § 668dd does not apply to his case. This is because the Court specifically instructed the parties to submit post-trial briefs on the strict liability issue. Blow included additional arguments in his brief beyond the scope defined by the Court.

State wherein any area is located." Blow recognizes that Title 4, Virginia Administrative Code § 15-50-60 is a Virginia regulation, ECF No. 10 at 7, and he also recognizes that 50 C.F.R. § 32.2(d) applies to his case, in part because it is listed on the black bear hunting permit issued to him by the Fish and Wildlife Service. ECF No. 10, attach. 1 at 2.

In tracing his charges from state regulation to federal regulation to federal statute, Blow stops at the federal regulation. But the fact that 50 C.F.R. § 32.2(d) qualifies as a regulation promulgated pursuant to § 668dd requires the extra step, and the final connection, to the federal statute. Section 668dd(f) lays out the penalties for violating a regulation issued pursuant to § 668dd. And because, as discussed above, 50 C.F.R. § 32.2(d) qualifies as a regulation issued pursuant to § 668dd(b)(5), the penalties outlined in § 668dd(f) apply to violations of 50 C.F.R. § 32.2(d). Therefore, although 16 U.S.C. § 668dd(f)(2) does not create a federal criminal offense related to bear hunting, it does provide penalties for those who violate 50 C.F.R. § 32.2(d) by violating state hunting regulations like Title 4, Virginia Administrative Code § 15-50-60. And so, § 668dd, specifically the penalty provision listed in 16 U.S.C. § 668dd(f)(2), applies to Blow's case.

### 2. The Assimilative Crimes Act does not apply to Blow's case.

In passing, Blow argues that the Assimilative Crimes Act, 18 U.S.C. § 13 ("ACA"), gives the Government the authority to prosecute him for violating a state regulation. *Id.* at 7. The ACA "fills gaps in federal criminal law" and states that any individual who engages in conduct within the territorial jurisdiction of the United States "which, although not made punishable by any enactment of Congress, would be punishable if committed . . . within the jurisdiction of the State . . . in which such place is situated . . . shall be guilty of a like offense and subject to a like punishment." *United States v. Fox*, 60 F.3d 181, 183 (4th Cir. 1995) (quoting 18 U.S.C. § 13(a))

(citing *Williams v. United States*, 327 U.S. 711, 718–19 (1946)).    A federal regulation "promulgated pursuant to specific congressional authorization and applied to the conduct of anyone on a federal enclave" qualifies as an enactment of Congress as that term is used in § 13(a). *Id.* at 184 (citing *United States v. Hall*, 979 F.2d 320, 322 (3d Cir. 1992)).

Blow appears to argue that he should have been charged under Virginia law pursuant to the ACA instead of federal law via 16 U.S.C. § 668dd(f)(2) and 50 C.F.R. § 32.2(d). ECF No. 10 at 7.    The Court finds that the government properly brought charges against Blow pursuant to § 668dd(f)(2) and 50 C.F.R. § 32.2(d).

In *United States v. Hope*, the defendant argued that he should have been charged pursuant to 36 C.F.R § 4.2 instead of the ACA after he was convicted of eluding a police officer on the Blue Ridge Parkway, which is managed by the National Park Service, in violation of Virginia Code § 46.2-817 and prosecuted for that charge pursuant to the ACA. No. 3:09-CR-00039-1, 2010 WL 2405354, at *1 (W.D. Va. June 10, 2010), *aff'd per curiam*, 408 F. App'x 695 (4th Cir. 2011).    The federal regulation at issue in that case, 36 C.F.R § 4.2, states that "traffic and the use of vehicles within a [National Park] area are governed by State law" unless other federal regulations provide otherwise.    The defendant argued that eluding a police officer qualified as a traffic offense, so he should have been charged under the regulation instead of the ACA.    *Hope*, 2010 WL 2405354, at *1.

The Court looked to the "gravamen" of the offense of eluding a police officer, and found that it involved "obstructive conduct at [its] core" and was not a routine traffic violation like those assimilated by 36 C.F.R § 4.2. *Id.* at *2.    Therefore, the defendant was properly charged under the ACA because the regulation at issue did not directly speak to his criminal conduct. *Id.* at *3.

This case presents the inverse of the issue in *Hope*. 2010 WL 2405354, at *1. Blow appears to argue that the ACA applies, so to charge him pursuant to 16 U.S.C. § 668dd(f) and 50 C.F.R. § 32.2(d) was improper because that statute and that regulation do not assimilate state hunting regulations. ECF No. 10 at 7. But 50 C.F.R. § 32.2(d) clearly assimilates Virginia's hunting regulations by requiring hunters on national wildlife refuges to "comply with the applicable provisions of the laws and regulations of the State wherein any area is located." Title 4, Virginia Administrative Code § 15-50-60 is applicable to hunting on a national wildlife refuge, and in fact, Blow explicitly recognizes that state regulation is applicable to his conduct. ECF No. 10 at 6 ("[T]he appropriate section to review is [4 Va. Admin. Code § 15-50-60]."). Therefore, citing 50 C.F.R. § 32.2(d) to charge an individual for violating a Virginia hunting regulation on a national wildlife refuge is consistent with the plain language of that regulation.

Blow does not argue that Title 4, Virginia Administrative Code § 15-50-60 is not an "applicable provision[] of the laws and regulations of" Virginia, and therefore not one of the laws assimilated under 50 C.F.R. § 32.2(d). Instead, he argues that 50 C.F.R. § 32.2(d) assimilates or adopts no state laws or regulations at all. Blow offers no argument as to why 50 C.F.R. § 32.2(d) cannot assimilate state hunting regulations; he simply states that § 668dd does not "incorporate state regulations as its own. This is why . . . it encourages the federal regulations to be as similar and consistent as possible with the state regulations." ECF No. 10 at 6. But Blow does not explain why a federal statute encouraging comity with state law prevents a regulation issued pursuant to the federal statute from adopting state law, and that explanation is not apparent to the Court. Nor does he explain why 50 C.F.R. § 32.2(d) would require that "[e]ach person shall" comply with applicable state laws when hunting on a national wildlife refuge if it did not mean to make state laws applicable to hunters in the National Wildlife Refuge system. Thus, as the Government

9

recognizes, "[i]n violating [an applicable provision of the Virginia Administrative Code], the defendant violated 50 C.F.R. § 32.2, which required him to comply with a state code." ECF No. 11 at 1.

Additionally, courts have recognized that regulations like 50 C.F.R. § 32.2(d)—specifically 36 C.F.R § 4.2—assimilate state law alongside the ACA. *United States v. Adames*, No. 1:17-CR-00072-MR-DLH, 2017 WL 4948068, at *3 (W.D.N.C. Nov. 1, 2017) ("[J]ust because a state statute is also assimilated under a [federal regulation] does not preclude it also being assimilated under [the ACA].") (citing *United States v. Hope*, 408 Fed. App'x. 695, 696 (4th Cir. 2011)). And because the federal regulation specifically makes it a federal offense to violate state hunting regulations, it is likely that the ACA is inapplicable because Blow's conduct is already addressed by a federal regulation. *Fox*, 60 F.3d at 183 ("[T]he United States may invoke the Assimilative Crimes Act to prosecute an offense under state law only when there is no enactment of Congress that punishes the offender."). Indeed, the "gravamen" of the offense that state regulation enumerates involves hunting, and state hunting regulations are applicable to hunting on a national wildlife refuge. *See Hope*, 2010 WL 2405354, at *2; 50 C.F.R. § 32.2(d). The Court, however, need not decide whether the government could prosecute Blow pursuant to the ACA instead of §668dd and 50 C.F.R. § 32.2(d). It is enough to recognize that the existence of the ACA does not prevent other federal statutes and regulations from assimilating state law, and here, the plain language of 50 C.F.R. § 32.2(d) indicates that it adopts state hunting regulations.

According to its plain language, 50 C.F.R. § 32.2(d) adopts applicable state laws and regulations, which the Court interprets to include Virginia's hunting regulations. Blow does not argue that Virginia's bear hunting regulations are inapplicable to his case. *See* ECF No. 10.

Therefore, the Court finds that the Government properly charged Blow pursuant to 16 U.S.C. § 668dd(f) and 50 C.F.R. § 32.2(d) instead of the ACA.

### B. Section 668dd(f)(2) imposes strict liability for unknowing violations of § 668dd and the regulations issued thereunder.

The next question before the Court is whether the Government must prove that Blow acted either negligently, recklessly, knowingly, or purposefully when he violated a regulation issued pursuant to 16 U.S.C. § 668dd. *See United States v. Bailey*, 444 U.S. 394, 404 (1980) (listing the four criminal mental states). Blow argues that, even if the Government correctly charged him pursuant to 16 U.S.C. § 668dd(f)(2), it failed to prove that he possessed the requisite mental state—Blow proposes either recklessness or negligence—to convict him under that statute. ECF No. 10 at 2. In other words, Blow argues that the Government must prove not just that he killed a female bear accompanied by a cub, but that he did so recklessly or negligently.

Section 668dd(f)(2) states only that "[a]ny person who otherwise violates or fails to comply with any of the provisions of this Act (including a regulation issued under this Act) shall be fined under Title 18 or imprisoned not more than 180 days, or both." Though the statute says nothing about the mental state required to violate it and commit the offense, Blow urges the Court to read such a requirement into the statute based on longstanding common-law principles. ECF No. 10 at 3. The Government argues that it need not prove that Blow acted with any specific mental state in committing the offense because § 668dd(f)(2) punishes violations of the statute that are "not 'knowing' [and are therefore] subject to the lowest level of punishment available, as petty offenses, rather than the higher misdemeanor punishment available for knowing violations." ECF No. 11 at 2.

11

Other courts have grappled with whether § 668dd(f)(2) includes a mental state element.[5] This Court finds that the statute does not, meaning that the Government need not prove that Blow acted with a specific mental state to convict him of violating § 668dd(f)(2). But before the Court addresses the parties' specific arguments, it is necessary to discuss the general principles of criminal *mens rea*, "strict liability"[6] crimes, and how the Supreme Court of the United States instructs Courts to determine whether a federal statute imposes strict criminal liability.

*1. Legal Standard*

The Supreme Court of the United States has observed that "the existence of a *mens rea* [element in a criminal offense] is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Staples v. United States*, 511 U.S. 600, 605 (1994) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436 (1978)). According to this understanding, the Supreme Court instructs that "offenses that require no *mens rea* generally are disfavored," and usually, "some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of the crime." *Staples*, 511 U.S. at 606 (citing *Liparota v. United States*,

---

[5] *See United States v. Speener*, No. 2:22-MJ-1031, 2024 WL 1404334, at *4 (E.D.N.C. Apr. 1, 2024); *Tait v. United States*, 763 F. Supp. 2d 786, 791 n.5 (E.D. Va. 2011); *United States v. Mast*, 938 F.3d 973, 977 (8th Cir. 2019); *United States v. Kenner*, 238 F. Supp. 3d 1157, 1163 (D. Neb. 2017); *United States v. Best*, No. 5:11-CR-00414 HRL, 2012 WL 3027544, at *5 (N.D. Cal. July 24, 2012); *United States v. Crawford*, No. 3:11-CR-105-JDR, 2012 WL 1028912, at *7 (D. Alaska Mar. 23, 2012); *United States v. Judah*, No. 3:11-PO-032, 2012 WL 1028944, at *4 (D. Alaska Mar. 23, 2012) (considering, but not deciding, whether 16 U.S.C. § 668dd(f)(2) includes a mens rea element); *United States v. Leal*, 565 F. Supp. 3d 874, 882 (S.D. Tex. 2021) ("The question as to what, if any, mens rea finding is required is largely academic. This is because the record supports a finding that Defendant acted purposely, which mental state determination satisfies all other potentially applicable mens rea requirements.").

[6] *In Staples v. United States*, the Supreme Court of the United States noted that the term "strict liability crimes," as it refers to crimes without a *mens rea* element, is "technically a misnomer." 511 U.S. 600, 607 n.3 (1994). Nonetheless, this Court and the Fourth Circuit continued to describe crimes without a mental state element as strict liability crimes, so the Court continues to use that term here. *See United States v. Boynton*, 63 F.3d 337, 343 (4th Cir. 1995); *Tait v. United States*, 763 F. Supp. 2d 786, 791 n.5 (E.D. Va. 2011).

471 U.S. 419, 426 (1985); *U.S. Gypsum Co.*, 438 U.S. at 438; *Morissette v. United States*, 342

U.S. 246, 263 (1952)).

The Supreme Court has long been reluctant to find that criminal statutes impose strict

criminal liability,[7] and it has interpreted statutes to include a mental state element "even where the

statutory text is silent on the question," *Rehaif v. United States*, 588 U.S. 225, 231 (2019) (citing

*Staples*, 511 U.S. at 605), and where "'the most grammatical reading of the statute' does not

support [a mental state element]." *Id.* (quoting *United States v. X-Citement Video*, 513 U.S. 64,

70 (1994)). This does not mean that crimes without a mental state element do not exist,[8] and the

---

[7] *See Morissette*, 342 U.S. at 273 (holding that a statute criminalizing embezzlement of government property included a *mens rea* element); *U.S. Gypsum Co.*, 438 U.S. at 443 (holding that the Government was required to prove intent to criminally convict a defendant for violating the Sherman Act); *Liparota v. United States*, 471 U.S. 419, 433–34 (1985) (holding that, to convict a defendant of unlawfully obtaining or possessing food stamps, the Government had to prove that the defendant knowingly obtained or possessed food stamps "in a manner unauthorized by statute or regulations"); *Staples*, 511 U.S. at 619 (holding that, to convict an individual of unlawfully possessing an unregistered machine gun, the government had to prove that the defendant knew his rifle had the characteristics that made it a machine gun pursuant to the applicable statute); *Posters 'N' Things , Ltd. v. United States*, 511 U.S. 513, 524–25 (1994) (holding that, to convict a defendant of using an interstate conveyance as part of a scheme to sell drug paraphernalia, the Government had to prove that the defendant knowingly used an interstate conveyance in a scheme to sell items "he knew were likely to be used with illegal drugs"); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 65–66 (1994) (holding that, to convict a defendant of transporting, shipping, receiving, distributing, or reproducing visual depictions of minors engaging in sexually explicit conduct under 18 U.S.C. § 2252, the Government had to prove that the defendant knew that the individual portrayed in the depiction was a minor); *Flores-Figueroa v. United States*, 556 U.S. 646, 647–55 (2009) (holding that, to convict a defendant pursuant to 18 U.S.C. § 1028A(a)(1), the government must prove that the defendant knew that the means of identity the defendant unlawfully transferred, possessed, or used in committing aggravated identity belonged to another person); *Elonis v. United States*, 575 U.S. 723, 740 (2015) (holding that 18 U.S.C. § 875(c) requires proof of a mental state greater than negligence to convict a defendant of violating that statute); *Rehaif v. United States*, 588 U.S. 225, 237 (2019) (holding that, to convict a defendant of unlawfully possessing a firearm as an individual unlawfully present in the United States under 18 U.S.C. § 922(g), the Government had to prove that the individual knew that they possessed a firearm and that they knew that they belonged to the "relevant category of persons barred from possessing a firearm").

[8] The Court traced the origin of crimes that "depend on no mental element but consist only of forbidden acts or omissions" back to the mid-Nineteenth Century and the industrial revolution in the United States, when new technology, crowded cities, and the wide distribution of goods led to a wave of new regulations. *Morissette*, 342 U.S. at 253–54 (tracing the history of strict liability crimes from the mid-Nineteenth Century to the mid-Twentieth Century); *see also* Jennifer A. Richie, *State v. Wingate: Fishing the Murky Waters of Louisiana's Strict Liability Crimes*, 57 La. L. Rev. 1415, 1418 (1997); Francis Bowes Sayre, *Public Welfare Offenses*, 33 Colum. L. Rev. 55, 67 (1933).

Supreme Court has upheld the validity of strict-liability offenses in several different contexts. *Rehaif*, 588 U.S. at 259 (Alito, J., dissenting) (collecting cases)[9]; *United States v. Skinner*, 536 F. Supp. 3d 23, 45 (E.D. Va. 2021) ("[W]hile crimes without a *mens rea* requirement are disfavored, Congress may impose strict liability for certain types of offenses.").

Supreme Court precedent provides a framework, or at least a list of considerations, for determining whether a statute or regulation creates a strict liability offense. As always, the Court must begin with the text of the statute because the question of whether a criminal statute contains a mental state element is a question of Congressional intent, and the text of the statute provides the best evidence of congressional intent. *Rehaif*, 588 U.S. at 228; *Staples*, 511 U.S. at 604. The Court must interpret the statute according to the presumption of scienter, meaning that it must presume that Congress intended that the criminal offense the statute creates contains a mental state element. *Rehaif*, 588 U.S. at 228–29 (quoting *X-Citement Video*, 513 U.S. at 72) ("In determining Congress' intent, we start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'"); *see also Elonis*, 575 U.S. at 737. That presumption may be rebutted if the text of the statute clearly excludes a mental state element, or if other evidence exists to suggest that Congress intended to do away with a mental state element. *Rehaif*, 588 U.S. at 258 (Alito, J., dissenting) ("Since a legislative body may enact

---

[9] *See United States v. Balint*, 258 U.S. 250, 254 (1922) (interpreting a statute that criminalized the sale of narcotics to impose strict criminal liability); *United States v. Behrman*, 258 U.S. 280, 289 (1922) (same); *United States v. Dotterweich*, 320 U.S. 277, 285 (1943) (interpreting a statute that criminalized the sale of adulterated pharmaceuticals to impose strict criminal liability); *United States v. Freed*, 401 U.S. 601, 610 (1971) (interpreting a statute that criminalized the possession of unregistered hand grenades to impose strict criminal liability).

a valid criminal statute with a strict-liability element, the dispositive question is whether it has done so or, in other words, whether the presumption that petitioner invokes is rebutted."); *Staples*, 511 U.S. at 618 (refusing to adopt a rule that the text of the statute must contain an explicit abrogation of a mental state element for strict liability to apply). Of course, this presumption applies alongside the traditional canons of statutory interpretation, and the Court should interpret statutes in a way that avoids Constitutional conflict and absurd results. *X-Citement Video*, 513 U.S. at 69, 73 (interpreting the statute at issue in a way that avoided both constitutional problems and absurd results); *Liparota*, 471 U.S. at 427 (interpreting the statute at issue according to the principle that ambiguous criminal statutes should be construed leniently).

If the statute's plain meaning is ambiguous from the text, the Court may consider legislative history and other indications of Congressional intent to determine whether the crime includes a *mens rea* element. *X-Citement Video*, 513 U.S. at 73 (examining a statute's legislative history to determine whether Congress intended to include a *mens rea* element in the statute at issue).

These other indications of intent include whether the offense prescribed by the statute fits within the "public welfare" doctrine and whether the offense is merely a codified common-law crime or completely statutory. *Staples*, 511 U.S. at 606. If the offense is part of a "regulatory" or "public welfare" program, *Rehaif*, 588 U.S. at 232, and/or it regulates a particularly dangerous object or activity that by its very nature puts the defendant on notice that their conduct will be regulated, it may be considered a public welfare offense and therefore more likely to impose strict criminal liability. *Staples*, 511 U.S. at 607 (explaining that public welfare offenses typically "involve statutes that regulate potentially harmful or injurious items" that, because of the danger they pose, put the defendant on notice that they may be subject to strict regulation just for using or possessing them); *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 522–23 (1994) ("Even

statutes creating public welfare offenses generally require proof that the defendant had knowledge of sufficient facts to alert him to the probability of regulation of his potentially dangerous conduct."). Beyond harmful or dangerous items, if the statute creates an offense that is part of a broad regulatory scheme, it may also fall within the public welfare doctrine. *See United States v. Morgan*, 311 F.3d 611, 616 (5th Cir. 2002) ("Finally, we note that the regulatory nature of daily possession limits and the penalty attached to misdemeanor offenses under the [Migratory Bird Treaty Act] are both consistent with a strict liability standard."); *United States v. Apollo Energies, Inc.*, 611 F.3d 679, 686 (10th Cir. 2010) (quoting *Staples*, 511 U.S. at 606) ("Finally, the Court in *Staples* took pains to reaffirm the basic proposition that 'public welfare' or 'regulatory' offenses can 'impose a form of strict criminal liability.'").

On the other hand, if the statute merely codifies a common law crime, specifically a felony, it is likely that it contains a mental state element, even if the text says nothing of the Defendant's mental state. *Morissette*, 342 U.S. at 257 ("The element of conscious wrongdoing, the guilty mind accompanying the guilty act, is associated with the concept of crimes that are punished as infamous."); *Staples*, 511 U.S. at 625 (Stevens, J., dissenting) ("In interpreting statutes that codified traditional common-law offenses, courts usually [applied the presumption of scienter], even when the text of the statute contained no such requirement.").

Another consideration is whether reading the statute to impose strict criminal liability would criminalize "a broad range of apparently innocent conduct." *Liparota*, 471 U.S. at 426; *see Rehaif*, 588 U.S. at 229; *Staples*, 511 U.S. at 610–12. For example, in *Liparota*, the statute at issue criminalized the unlawful use, transfer, acquisition, alteration or possession of food stamps. 471 U.S. at 426. The Court held that reading that statute to impose strict criminal liability could lead to the conviction of a nonrecipient of food stamps who received food stamps by mistake in the

16

mail. *Id.* at 426–27 *cf. United States v. Freed*, 401 U.S. 601, 609 (1971) ("[O]ne would hardly be surprised to learn that possession of hand grenades is not an innocent act."). Reiterating this point in *Staples*, the Court connected its concern about criminalizing innocent conduct to the public welfare offense doctrine. 511 U.S. at 610. The Court held that there is "a long tradition of widespread lawful gun ownership by private individuals in this country" and that guns, unlike grenades or toxic waste, do not automatically put their owners on notice of the potential for strict regulation. *Id.* at 610–11. In *Carter v. United States*, the Court recognized that a statute criminalizing taking property, money, or another thing of value belonging to a bank by force and violence or by intimidation only included a "general intent" requirement, meaning the government only needed to show that an individual intended to take an object by force and violence or intimidation to satisfy the presumption of scienter. 530 U.S. 255, 269 (2000). The Government did not need to prove that the individual took the object by force with an intent to steal or purloin that item. *Id.* The Court reasoned that this general intent requirement sufficiently separated innocent and criminal conduct, because if an individual knew that they took an object from the bank by force or intimidation, they could not have been acting innocently. *Id.* ("[The statute] certainly should not be interpreted to apply to the hypothetical person who engages in forceful taking of money while sleepwalking . . . but this result is accomplished simply by requiring, as *Staples* did, general intent—i.e., proof of knowledge with respect to the *actus reus* of the crime."); *See also United States v. Lewis*, 628 F.2d 1276, 1279 (10th Cir. 1980), *cert. denied*, 450 U.S. 924 (1981) (discussing the difference between general and specific intent in a case where the defendant robbed a bank but deliberately failed to flee so he would be arrested, returned to prison, and treated for alcoholism).

Therefore, if interpreting a criminal statute to impose strict criminal liability would criminalize a "broad range of apparently innocent conduct," the criminal offense probably contains a mental state element. *Liparota*, 471 U.S. at 426. And if the Court determines that the statute does criminalize a broad range of otherwise innocent conduct and therefore requires a mental state element, it reads into the statute "only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." *Elonis*, 575 U.S. at 736 (quoting *Carter*, 530 U.S. at 269) (internal quotation marks omitted).

It is important to note that in its discussion of the "innocent conduct" analysis, the Supreme Court instructs courts to avoid interpreting statutes to impose strict liability where that interpretation would "[sweep] in individuals who had no knowledge of the facts that made their conduct blameworthy." *Id.* at 735. In *Staples*, the Supreme Court connected this concern to the question of whether the nature of the activity or object restricted by the statute would, by its nature, give individuals notice of the possibility of strict regulation. 511 U.S. at 611–12. This does not automatically depend on whether the object or activity is inherently dangerous, though whether an object or activity is inherently dangerous or unique may factor in the analysis. *Id.* at 614 (holding that, although automobiles may be dangerous, "we probably would hesitate to conclude on the basis of silence that Congress intended a prison term to apply to a car owner whose vehicle's emissions levels, wholly unbeknownst to him, began to exceed legal limits between regular inspection dates"). Instead, the Court placed more emphasis on whether the individual's conduct or use of a specific object would give an individual sufficient notice that their conduct was unlawful or subject to regulation. "We are reluctant to impute [the purpose of imposing strict liability through the statute at issue] to Congress where, as here, it would mean easing the path to convicting persons whose conduct would not even alert them to the probability of strict regulation

18

in the form of a statute such as § 5861(d)." *Id.* In short, the "innocent conduct" concern is based primarily on whether the nature of the conduct at issue alerts an individual to the possibility of specific, strict regulation. *See id.* at 612–14.

Finally, the Court must examine the potential penalty imposed by the offense. As the Supreme Court recognized in *Staples*:

> Historically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea*. Certainly, the cases that first defined the concept of the public welfare offense almost uniformly involved statutes that provided for only light penalties such as fines or short jail sentences, not imprisonment in the state penitentiary.

*Id.* at 616. Thus, the Supreme Court has held several times that a potential penalty of ten years in prison for a violation of a criminal statute is a harsh penalty that suggests that the statute does not impose strict criminal liability. *Id.*; *X-Citement Video, Inc.*, 513 U.S. at 72; *Rehaif*, 588 U.S. at 232. The Court also held that a potential sentence of three years, or a maximum fine of $100,000, or both of those potential sentences combined were "severe" sanctions that did not support a reading of a criminal statute that imposed strict criminal liability. *U.S. Gypsum Co.*, 438 U.S. at 442 n.18. But a misdemeanor that does not carry with it the threat of a long prison sentence or an exorbitant fine may still be read to impose strict criminal liability. *See Staples*, 511 U.S. at 616.

With these principles in mind, the Court moves on to its analysis of whether § 668dd(f)(2) imposes strict criminal liability.

### 2. Precedent from this Court and the Eastern District of North Carolina indicates that § 668dd(f)(2) imposes strict criminal liability.

At the outset of its analysis, the Court recognizes that this Court and another district court within the Fourth Circuit have determined, at least in dicta, that § 668dd(f)(2) imposes strict criminal liability. *Tait v. United States*, 763 F. Supp. 2d 786, 791 n.5 (E.D. Va. 2011); *United*

*States v. Speener*, No. 2:22-MJ-1031, 2024 WL 1404334, at *4 (E.D.N.C. Apr. 1, 2024). In *Tait*,

the Government charged the Defendant with violating 50 C.F.R. § 27.61, which makes it a crime

to destroy, injure, deface, disturb, or remove without authorization any public or private property

on or from any national wildlife refuge. 763 F. Supp. 2d at 786. The defendant was convicted at

a bench trial for "removing private property," not knowingly removing private property, so 16

U.S.C. § 668dd(f)(2) applied. *Id.* In a footnote, the Court explained that:

> There was also some discussion at trial as to whether the Government had proved
> that Tait acted with criminal intent . . . Though Tait did not raise this issue on
> appeal, the plain language of the regulation (which has no "knowledge"
> requirement) and the legislative history of the regulation show that Congress
> intended to criminalize such behavior, even when the perpetrator unintentionally
> committed the act. *See* 105 CIS Legis. Hist. P.L. 312 (1998) (stating that Public
> Law 105–312 "[a]mends the National Wildlife Refuge System Administration Act
> of 1966 to reduce the penalty for unintentionally committing violations of the act.").

*Id.* at 791 n.5. Although this explanation questions whether "the regulation" imposes strict

criminal liability, the Court's invocation of the National Wildlife Refuge System Administration

Act suggests that it also applies to the federal statute at issue, specifically § 668dd(f)(2). *See id.*

The Court in *Speener* engaged in a more specific analysis of § 668dd(f)(2). 2024 WL

1404334, *3–4. In that case, the United States District Court for the Eastern District of North

Carolina held that § 668dd(f)(2) imposed strict criminal liability for two reasons. *Id.* at *4–5.

First, it held that although the Fourth Circuit had not interpreted § 668dd(f)(2), it had interpreted

a similar statute, contained in the Migratory Bird Treaty Act, as imposing strict criminal liability.

*Id.* at *4. Second, it gave weight to "the *Tait* court's acknowledgement that it would interpret §

668dd(f)(2) as imposing strict liability." *Id.*

The court's analysis in *Speener* is persuasive, and the Court finds, similarly, that the Fourth

Circuit and other courts of appeals' interpretation of the Migratory Bird Treaty Act is relevant

here. *See infra* Section I.B.4. The Court also finds that the discussion of strict liability in *Tait* is

persuasive dicta, but not decisive, given that it was not a central issue to that case nor raised on appeal from the magistrate judge's conviction of the defendant. *Tait*, 763 F. Supp. 2d at 791 n.5. Keeping both *Speener* and *Tait* in mind, the Court turns to its own analysis of § 668dd(f)(2) conducted pursuant to Supreme Court precedent.

### 3. The text of 16 U.S.C. § 668dd(f)(2) is ambiguous as to whether the offense contains a mental state element.

The Court must determine whether, to convict Blow pursuant to 16 U.S.C. § 668dd(f)(2), the Government must prove that he acted with a specific mental state when he violated a regulation issued pursuant to § 668dd, or whether § 668dd(f)(2) is a strict liability offense. This is a question of statutory interpretation, so as always, the Court begins by examining the text of § 668dd(f)(2) and § 668dd as a whole to see if the plain meaning of the text answers the question. *Rehaif*, 588 U.S. at 229; *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010) (quoting *United States v. Morton*, 467 U.S. 822, 828 (1984)) (citation modified) ("We do not construe statutory phrase in isolation; we read statutes as a whole.").

Blow argues that the text of the statute indicates that Congress did not intend for § 668dd(f)(2) to impose strict criminal liability on those who are charged with violating § 668dd or a regulation issued thereunder. *See* ECF No. 10 at 7. He argues that while § 668dd(f) "describes two types of violations: knowing and unknowing violations, Congress did not intend for the latter 'unknowing' violation to be strict liability offenses." *Id.* If Congress had intended to impose strict criminal liability, Blow explains, "[it] would have certainly included language to that effect." *Id.* Blow contends that the absence of that additional language demonstrates that Congress intended for § 668dd(f)(2) to include a *mens rea* element such as recklessness or negligence. *Id.*

The text of § 668dd(f)(2) and the statutory provisions that surround it suggest that Congress took care to distinguish knowing and unknowing violations of 16 U.S.C. § 668dd. Section

668dd(f)(1) specifically applies to "knowing" violations of the statute or the regulations issued thereunder, while § 668dd(f)(2) applies to "any person who otherwise violates or fails to comply" with the statute or regulations issued pursuant to the statute.

This distinction is the only conclusion that can be drawn from the plain language of the statute regarding a mental state element. But Blow argues that this distinction answers the question of whether § 668dd(f)(2) imposes strict criminal liability because there are mental states below "knowingly"—specifically recklessness or negligence. ECF No. 10 at 7. Indeed, the four levels of criminal *mens rea*, in descending order of culpability, are purpose, knowledge, recklessness, and negligence. *Bailey*, 444 U.S. at 404. Congress included no language explicitly labelling violations of § 668dd(f)(2) strict liability offenses, Blow argues, so the fact that the term "knowingly" appears in § 668dd(f)(1) shows that one or both of the two lesser levels of *mens rea* apply to violations of § 668dd(f)(2). ECF No. 10 at 7.

But just because Congress separated knowing violations from "other violations" does not mean that § 668dd(f)(2) requires the government to prove that the defendant acted negligently or recklessly. *See United States v. Mast*, 938 F.3d 973, 980 (Colloton, J., dissenting) ("'*Un*intentional' does not mean 'negligent.' One who acts without *mens rea*, just as much as one who acts negligently, commits an 'unintentional violation' or one that is 'not "knowingly" committed.'").[10] And the Supreme Court "has long been reluctant to infer that a negligence

---

[10] In several Supreme Court cases, the Court has analyzed whether the word "knowingly," included in one section of a statute, applies to other provisions of the same statute that could otherwise impose strict criminal liability. *Rehaif*, 588 U.S. at 230–33; *X-Citement Video*, 513 U.S. at 73. In other words, the Court's precedent indicates that, where the term "knowingly" applies to one section of the statute and not others, a *mens rea* requirement of negligence or recklessness does not automatically graft onto the sections not covered by the "knowingly" modifier unless that is the mental state that separates innocent and wrongful conduct. *See Elonis*, 575 U.S. at 741 (holding that the mental state requirement of the statute at issue is satisfied if the Government proves that the Defendant acted purposefully or knowingly but declining to decide whether recklessness would also suffice). The imposition of a lower level of *mens rea* comes after the consideration of whether Congress meant to create a strict liability offense. *Id.*

standard was intended in criminal statutes." *Elonis*, 575 U.S. at 738 (quoting *Rogers v. United States*, 422 U.S. 35, 47 (1975) (Marshall, J., concurring)).[11]  Congress's specification of a knowing mental state in § 668dd(f)(1) does not mean that a less culpable mental state automatically applies to violations charged under § 668dd(f)(2).

In short, the plain text of the statute does not answer the question of whether § 668dd(f)(2) contains a *mens rea* element.  The statute takes care to differentiate between knowing and unknowing violations, but it makes no mention of a *mens rea* element in § 668dd(f)(2).  And just because § 668dd(f)(1) applies to knowing violations does not mean that the lower mental states of negligence or recklessness automatically apply to § 668dd(f)(2).  Although the absence of a *mens rea* element in the text of § 668dd(f)(2) is not determinative, it provides some evidence of congressional intent to impose strict criminal liability through that statute.  *See United States v. Apollo Energies*, 611 F.3d 679, 686 (10th Cir. 2010) ("While we did not cite to *Staples* in *Corrow*, our reasoning was that although the [Migratory Bird Treaty Act] was silent as to *mens rea*, its "plain language"—an indicia of legislative intent—supported a strict liability interpretation."); *Bostock v. Clayton County, Ga.*, 590 U.S. 644, 654 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."). Nonetheless, considering the presumption of scienter and the Supreme Court's reluctance to find

---

[11] In *Elonis*, the Court held that the Government had to prove a mental state greater than negligence to convict an individual under 18 U.S.C. § 875(c).  575 U.S. at 740.  The Court recognized that proving a purposeful or knowing mental state could sustain a conviction pursuant to that statute.  *Id.* at 740.  However, the Court declined to decide whether a *mens rea* of recklessness would be sufficient to satisfy the presumption in favor of scienter.  *Id.* at 740–41.  ("We may be capable of deciding the recklessness issue, but following our usual practice of awaiting a decision below and hearing from the parties would help ensure that we decide it correctly.") (internal quotation marks and citations omitted).  Later, in *Counterman v. Colorado*, the Court held that recklessness was the appropriate level of *mens rea* to convict an individual of making a true threat.  600 U.S. 66, 79 (2023).  In that case, the Supreme Court held that a *mens rea* of recklessness was required to convict an individual of making a true threat under a state statute without violating the First Amendment.  *Id.*

that a statute imposes strict criminal liability even when the statute is silent on the issue, *Rehaif*,

588 U.S. at 231, the Court finds that the text of the statute is ambiguous, and thus moves to other

indications of Congressional intent. *King v. Burwell*, 576 U.S. 473, 492 (2015) ("Given that the

text is ambiguous, we must turn to the broader structure of the Act to determine the meaning [of

the statute at issue]."); *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make

use of legislative history believe that clear evidence of congressional intent may illuminate

ambiguous text."); *R.R. ex rel. R. v. Fairfax Cnty. Sch. Bd.*, 338 F.3d 325, 329 (4th Cir. 2003)

("Only if the text of the statute is ambiguous or if the statutory scheme is inconsistent or incoherent

need we inquire further.").

### 4. *The Courts of Appeals' interpretation of the Migratory Bird Treaty Act suggests that § 668dd(f)(2) imposes strict criminal liability.*

In broadening the scope of its interpretive inquiry, the Court looks to other, similar sections

of the United States Code to understand Congress's intent in drafting § 668dd(f)(2). *See Hardt v.*

*Reliance Standard Life Ins. Co.*, 560 U.S. 242, 254 (2010) (comparing fee-shifting provisions in

multiple statutes).[12]   As the court recognized in *Speener*, the Migratory Bird Treaty Act,

("MBTA"), 16 U.S.C. §§ 703–711, is similar to the statute at issue here. 2024 WL 1404334, at

---

[12] The Supreme Court has often looked to the text of other statutes, and its interpretation of that text, in clarifying ambiguous statutory language. Sometimes, this inquiry is limited to a single word. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 717 (1995) (Scalia, J., dissenting) (citing other federal statutes to determine the meaning of "take" in the Endangered Species Act). In other situations, the Court looks to the legislature's consistent use of a specific phrase. *See W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 88 (1991), *superseded by statute on other grounds*, 42 U.S.C. § 1988(c) (1994) (examining statutes other than the one at issue in that case to determine the meaning of the phrase "attorney's fee"). And in cases like *Hardt*, the Court compared broader statutory provisions to understand ambiguous statutes. 560 U.S. at 254; *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 641 (2007), overruled by statute, Lilly Ledbetter Fair Pay Act of 2009, 123 Stat. 5, *as recognized in Green v. Brennan*, 578 U.S. 547, 561 (2016) ("Ledbetter is on firmer ground in suggesting that we look to cases arising under the National Labor Relations Act (NLRA) since the NLRA provided a model for Title VII's remedial provisions and, like Title VII, requires the filing of a timely administrative charge (with the National Labor Relations Board) before suit may be maintained.").

*4. Both statutes implement and authorize a broad regulatory scheme for administering wildlife protection and are found within the same title of the United States Code.[13] *United States v. Engler*, 806 F.2d 425, 432 (3d Cir. 1986), *cert. denied,* 481 U.S. 1019 (1987) (citing *Missouri v. Holland*, 252 U.S. 416, 435 (1920)) ("[T]he MBTA is a regulatory measure designed to protect the public welfare, derived not from the common law but from a series of treaties with other states.")); 16 U.S.C. § 668dd(b)(5) ("In administering the [National Wildlife Refuge System], the Secretary [of the Interior] is authorized to . . . [i]ssue regulations to carry out this Act."). And like § 668dd(f), the MBTA imposes a two-tiered penalty system that distinguishes between specific, knowing violations and other violations of the statute:

> (a) Except as otherwise provided in this section, any person, association, partnership, or corporation who shall violate any provisions of said conventions or of this subchapter, or who shall violate or fail to comply with any regulation made pursuant to this subchapter shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $15,000 or be imprisoned not more than six months, or both.

> (b) Whoever, in violation of this subchapter, shall knowingly—

>> (1) take by any manner whatsoever any migratory bird with intent to sell, offer to sell, barter or offer to barter such bird, or

>> (2) sell, offer for sale, barter or offer to barter, any migratory bird shall be guilty of a felony and shall be fined not more than $2,000 or imprisoned not more than two years, or both.

16 U.S.C. § 707(a)–(b). As discussed above, 16 U.S.C. § 668dd(f) contains a similar distinction between knowing and "other" violations. *Supra* Section I.A.1. Neither § 707(a), which is sometimes called the MBTA's "misdemeanor provision[]," *Engler*, 806 F.2d at 431, nor § 668dd(f)(2) contain specific language related to a mental state element.[14] And yet, the Courts of

---

[13] 16 U.S.C. § 668dd(a)(5) specifically discusses migratory bird protection efforts.

[14] In discussing strict liability for misdemeanor violations of the MBTA, courts hold that both 707(a) and other provisions of the statute implicated in misdemeanor prosecutions, such as § 703, impose strict criminal

Appeals have widely held that misdemeanor violations of the MBTA, except for specific exceptions, are subject to strict criminal liability. *See United States v. Boynton*, 63 F.3d 337, 343 (4th Cir. 1995) (collecting cases)[15]; *United States v. Pitrone*, 115 F.3d 1, 5 (1st Cir. 1997); *United States v. Morgan*, 311 F.3d 611, 614 (5th Cir. 2002); *United States v. Corrow* 119 F.3d 796 (10th Cir. 1997); *United States v. Wulff*, 758 F.2d 1121, 1124 (6th Cir. 1985); *Apollo Energies*, Inc., 611 F.3d at 685; *Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*, 478 F. Supp. 3d 469, 478–79 (S.D.N.Y. 2020) (citing *United States v. FMC Corp.*, 572 F.2d 902, 906, 908 (2d Cir. 1978)) ("The Second Circuit in [*United States v. FMC Corp.*] held that the MBTA imposes strict liability for misdemeanor violations . . . Since *FMC* was decided in 1978, no circuit has held that the MBTA requires the government to prove a guilty state of mind . . .").

Section 707 of the MBTA did not always contain a distinction between knowing, felony violations and other misdemeanor violations, and some Courts held that even felony violations of

---

liability. *Compare Corrow*, 119 F.3d at 805 ("[W]e now join those Circuits which hold misdemeanor violations under § 703 are strict liability crimes.") *with United States v. Gilkerson*, No. CR 07-30025, 2010 WL 11632582, at *3 (D.S.D. Feb. 22, 2010) ("Section 707(a) imposes strict liability."). The Court finds that this distinction does not matter for the purpose of this analysis, however, since these courts hold that the language of § 707(a) itself does not preclude a finding of strict liability in these courts' analyses, and §707(a) merely provides the penalty for violations incurred under § 703.

[15] *Boynton* and several other Fourth Circuit cases held that the MBTA specifically imposed strict criminal liability for hunting over a baited field. 63 F.3d at 344; *United States v. Chandler*, 753 F.2d 360, 363 (1985); *United States v. Jarman*, 491 F.2d 764, 766 (4th Cir. 1974). These cases interpreted statutes and regulations, issued pursuant to the MBTA, that made it a crime to take migratory birds by aid of bait. *See Boynton*, 63 F.3d at 344. In 1998, Congress added a scienter requirement to the MBTA's provision governing baiting offenses. Pub. L. 105-312, Title I, § 102, 112 Stat. 2956; 16 U.S.C. § 704(b); *Morgan*, 311 F.3d at 614 (citing 16 U.S.C. § 704(b)(1)) ("Congress later amended the MBTA to require proof that a hunter knew or reasonably should have known that he was hunting over a baited area."). But this legislative change did not touch the general principle that other misdemeanor violations of the MBTA, charged and prosecuted under §§ 703 and 707(a), remain strict liability offenses. *See Morgan*, 311 F.3d at 615–17. When it added a *mens rea* element to the bait offenses, Congress, in the corresponding Senate Report, indicated that "[t]he elimination of strict liability, however, applies only to hunting with bait over baited areas, and is not intended in any way to reflect upon the general application of strict liability under the MBTA." S. Rep. No. 105-366, at 2 (1998). Therefore, the Fourth Circuit's analysis of § 707(a), specifically the fact that it read that statute to impose strict criminal liability for misdemeanor violations of the MBTA, remains applicable. *Boynton*, 63 F.3d at 344.

the MBTA were strict liability offenses. *See* Pub. L. No. 86-732 § 6, 74 Stat. 866 (1960) (increasing the penalty for felony violations without adding a *mens rea* requirement); *Wulff*, 758 F.2d at 1125 (recognizing that the MBTA's felony provisions imposed strict liability, but holding that such an imposition of strict liability for a felony violated the defendant's right to due process and was thus unconstitutional); *Engler*, 806 F.2d at 432. Then, Congress amended the MBTA to specifically impose a *mens rea* element on felony violations in 1986. Pub. L. No. 99–645, § 501, 100 Stat 3582 (1986); *Morgan*, 311 F.3d at 615. To do so, it split Section 707 in two, requiring a proof of a "knowing[]" mens rea to convict a defendant of a felony under the MBTA while leaving the misdemeanor provision of that statute without a *mens rea* element. *See* § 707(a)–(b). However, Congress took care to specify, in the legislative history, that "Nothing in this amendment is intended to alter the 'strict liability' standard for misdemeanor prosecutions under 16 U.S.C. § 707(a), a standard which has been upheld in many Federal court decisions." S. Rep. No. 99–445, at 16 (1986). Courts continued to hold that misdemeanor violations prosecuted under § 707(a) were strict liability offenses. *Boynton*, 63 F.3d at 343. And when Congress later amended the MBTA again to add a scienter requirement for offenses dealing with hunting with bait in violation of § 704(b), Pub. L. 105-312, § 102, 112 Stat. 2956 (1998), it specified that "[t]he elimination of strict liability, however, applies only to hunting with bait or over baited areas, and is not intended in any way to reflect upon the general application of strict liability under the MBTA." S. Rep. No. 105–366, at 2 (1998); *see also Morgan*, 311 F.3d at 615 (relying on both statements in interpreting whether the MBTA continued to impose strict liability for misdemeanor violations). Moreover, after these amendments, courts continued to hold that misdemeanor violations under the MBTA, prosecuted pursuant to 16 U.S.C. § 707(a), were strict liability offenses. *See Morgan*, 311 F.3d at

615–16; *Apollo Energies*, 611 F.3d at 686; *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 492 (5th Cir. 2015).[16]

This discussion relates to the Court's analysis of § 668dd(f) because it shows that courts have long interpreted a statutory scheme that, like § 668dd(f), differentiates between "knowing" and "other" violations to impose strict liability for the latter, misdemeanor offenses.[17] The key similarity is that both statutes contain a "knowing" mental state element for more severe felony or Class A misdemeanor provisions while remaining silent as to a mental state element for less severe misdemeanor or Class B misdemeanor provisions. Courts have held that this differentiation matters, and that strict liability applies to the misdemeanor provisions that Congress drafted without specifying a mental state element. *See, e.g., Morgan*, 311 F.3d at 615–16. Therefore, the Court, like the court in *Speener*, finds that the Fourth Circuit and other Courts of Appeals' interpretation of § 707(a) provides persuasive evidence that Congress intended to impose strict criminal liability for misdemeanor violations of § 668dd and its associated regulations prosecuted pursuant to § 668dd(f)(2). 2024 WL 1404334, at *4. And the Court declines to depart from the reasoning of these holdings by interpreting a similar statutory scheme to impose an entirely different and unspecified mental state requirement.

Although the legislative history of a strikingly comparable statute is certainly not determinative, it does provide some support for the conclusion that § 668dd(f)(2) imposes strict

---

[16] In *CITGO Petroleum Corp.*, the Court held that a corporation was not liable for taking migratory birds in violation of 16 U.S.C. § 703 when migratory birds allegedly died after landing in uncovered industrial equalization tanks. 801 F.3d at 492. Although the Court recognized that the MBTA "imposes strict liability on violators," it interpreted the term "take" to criminalize only "an affirmative action to cause migratory bird deaths." *Id.* at 488, 492.

[17] The comparison is even more useful in that the two statutes promote similar regulatory agendas and are found in the same title of the United States Code. *See* 16 U.S.C. § 668dd(a) (describing the purpose of the statute as it relates to the management of the National Wildlife Refuge System); 16 U.S.C. § 703(a) (describing the purpose of the Migratory Bird Treaty Act).

criminal liability. *See Morgan*, 311 F.3d at 615–16 (quoting *United States v. Clark*, 445 U.S. 23, 33 n.9 (1980)) (holding that, although the court did not "accord great weight" to one Congress's commentary on an Act passed by an earlier congress, legislative commentary about the MBTA's strict liability standard was still a relevant indication of congressional intent).

   *5. The legislative history of § 668dd(f)(2) is inconclusive.*

   When the plain meaning of a statute is ambiguous, the Court may turn to external sources to determine Congress's intent. *See X-Citement Video*, 513 U.S. at 69–72. The Supreme Court has examined legislative history to determine whether a specific criminal offense contains a mental state element. *Id.* at 73.

   Blow cites two cases that hold that legislative history indicates that Congress did not intend for § 668dd(f)(2) to impose strict criminal liability. *See* ECF No. 10 at 8 (citing *Mast*, 938 F.3d at 973; *Kenner*, 238 F. Supp. 3d at 1157). Both opinions cite an earlier case, *United States v. Best*, so the Court begins its analysis there. No. 511-cr-414, 2012 WL 3027544, at *4–5 (N.D. Cal. July 24, 2012).

   In *Best*, the Court conducted the following analysis of the legislative history of § 668dd(f)(2) in answering the strict liability question:

>   [T]he 1998 Senate Report indicates that the amendment separating § 668dd(f) into two subsections was introduced to "reduce[ ] the penalty for unintentional violations of the National Wildlife Refuge System Administration Act" since, as it was enacted, "all violations of the act are class A misdemeanors, regardless of whether or not it was an intentional violation." According to Senator Chafee, "unintentional violations" would thereafter be a class B misdemeanor. S.Rep. No. 105–145, at 12438 (1998). The comments from the House of Representatives echo this intent. H. Rep. No. 105–142, at 10475 (1998). Neither the Senate nor the House stated that the purpose of the amendment was to create an entire species of strict liability crimes.

*Best*, 2012 WL 3027544, at *4.[18]  The Court held that because this legislative history did not present "a more instructive comment from Congress," distinguishing between "intentional and unintentional violations cannot be equated with differentiating between intentional and strict liability violations." *Id.* at 5. This holding reflects *Staples*' warning that, absent express or implied implication of Congressional intent to the contrary, courts should be wary of "dispens[ing]" with *mens rea* as an element of a crime.  *Id.* at 3 (quoting *Staples*, 511 U.S. at 606).

Kenner repeated the same analysis, agreeing that § 668dd(f)(2) contains a mental state element of negligence.  238 F. Supp. 3d at 1163.  Then, in *Mast*, the Eighth Circuit revisited the legislative history.  938 F.3d at 976. In its analysis of that history, it noted that:

> The National Wildlife Refuge System Improvement Act of 1998 amended 16 U.S.C. § 668dd to include subsections (f)(1) and (f)(2). Pub. L. No. 105–312, sec. 206, 112 Stat. 2956. An earlier version of § 668dd provided a single penalty for anyone "who violates or fails to comply with" subsection (c), which at that time prohibited "knowingly disturb[ing]" NWRS property. § 669dd(c) & I (1996). The statute was amended two years later to provide for certain penalties for "knowing violations" and lesser penalties for "other violations." National Wildlife Refuge System Improvement Act of 1998 sec. 206. A committee report indicates that the amendment was meant to provide more stringent penalties when "the person acted 'knowingly,' that is, acted voluntarily and intentionally, not through ignorance, mistake, or accident," and "lower[ ]" penalties "for unintentional violations (those not 'knowingly' committed)." S. Rep. No. 105-310, at 3 (1998), 1998 WL 596837.

*Id.* at 976–77. The Court read further into this history, noting that "the language of the committee report indicates that, in distinguishing between the two types of violations, Congress intended for subsection (f)(2) to proscribe negligent violations." *Id.* at 977. The Court held that by specifying that unknowing violations are those incurred through ignorance, mistake, or accident, Congress

---

[18] In a footnote, the Court noted that: "Although not directly applicable to the present question, it is noteworthy that the amendment to § 668dd(f) was introduced along with an amendment to *eliminate* strict liability language from the Migratory Bird Treaty Act, 16 U.S.C. § 704. S. Rep. No. 105–145, at 12438 (1998)." *Best*, 2012 WL 3027544, at *4 n.4. But as the Court discussed above, the 1998 amendment to the MBTA only eliminated strict liability for baited hunting offenses while leaving previous interpretations of the misdemeanor provision of that statute, § 707(a), to continue imposing strict liability. *Supra* Section I.B.4; *Morgan*, 311 F.3d at 616.

suggested that a negligence standard applies. *Id.* (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1998)).

This Court reads the legislative history differently. It finds that the legislative history only demonstrates Congress's intent to separate knowing and unknowing violations in the statute. Indeed, as the dissent in *Mast* noted, an unknowing offense is not automatically a negligent one. *Id.* at 980 (Colloton, J., dissenting). And reading a negligent mental state element into the statute based on the language one Congressional Committee included in a report reads too far into limited legislative history.

The Court agrees that the legislative history does not contain a firm statement of congressional intent to make a violation under § 668dd(f)(2) a strict liability offense. But it does not agree that the absence of that clear statement means that strict liability cannot apply. *See Rehaif*, 588 U.S. at 236 (finding that specific language in a House report suggested that the statute did not impose strict liability but nonetheless finding that the legislative history was "at best inconclusive"). In both *Best* and *Mast*, the courts held that in the absence of a clear indication from Congress, either in the plain text of the statute or the legislative history, that the statute at issue was intended to impose strict criminal liability, the court should not read that statute to dispense with a mental state element. *Best*, 2012 WL 3027544, at *3 (quoting *Staples*, 511 U.S. at 606) ("Due to the strength of [the legal system's disfavor of strict liability offenses], the United States Supreme Court has 'suggested that some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime.'"); *Mast*, 938 F.3d at 977 ("Because neither the statutory language nor the legislative history indicates an intent to dispense with a mental state requirement as an element of § 668dd(f)(2), courts may not treat the statute as setting out a strict liability offense; some mental state is required.").

31

But in *Staples*, the Supreme Court specifically declined to impose this clear-statement requirement on criminal statutes. 511 U.S. at 618. "In this view, absent a clear statement from Congress that *mens rea* is not required, we should not apply the public welfare offense rationale to interpret any statute defining a felony offense as dispensing with *mens rea* . . . We need not adopt such a definitive rule of construction to decide this case, however." *Id.* In *Staples*, the Court examined the text of the statute, but even though that text lacked a clear indication of intent to impose strict liability, it expanded its analysis to consider whether the statute criminalized a broad range of apparently innocent conduct, whether it fell within the public welfare doctrine, and the sentence it imposed. *Staples*, 511 U.S. at 607–620.    Later opinions contain the same broad analysis, even when the text supported the existence of a mental state element. *See Rehaif*, 588 U.S. at 231 (analyzing a statute's potential *mens rea* requirement "beyond the text" despite finding congressional intent to impose a *mens rea* element in the text).    And as discussed above, Courts interpreted the MBTA to impose strict liability for misdemeanor violations before Congress offered a clear statement in support of that interpretation in the legislative history of that statute. *See Wulff*, 758 F.2d at 1124.

The Court finds that the legislative history of § 668dd(f)(2) indicates only that Congress intended to separate knowing and unknowing violations of § 668dd and its associated regulations, a meaning already confirmed by the text of the statute.    Indeed, an earlier version of the statute provided only one penalty for violations of the statute or regulations issued thereunder. 16 U.S.C. §§ 668dd(c), 668dd(e) (1996).    Then, in 1998, Congress amended the statute to separate knowing and unknowing violations. Pub. L. No. 105–312, sec. 206, 112 Stat. 2956.    The legislative history of this amendment shows that Congress meant to lessen the penalty for unintentional violations of the statute. *See* 144 Cong. Rec. S10670-02 (1998) (daily ed. Sep. 21, 1998) (statement of Sen.

32

John Chafee) ("Currently, all violations of the act are class A misdemeanors, regardless of whether or not it was an intentional violation. Unintentional violations will now be a class B misdemeanor."). A Senate report states that the purpose of the 1998 amendment to the statute was to provide separate penalty provisions for knowing and unknowing violations. S. Rep. 105-310, at 2 (1998).[19]

However, the Senate report also indicates, in its budget provision, that the amendment to the statute would make unintentional violations "easier to prosecute," and that even though the maximum penalty for unintentional violations of the statute shrunk, "any receipts forgone as a result of the reduction in the maximum penalty is likely to be more or less offset in any given year by additional fines collected as a result of an increase in prosecutions." *Id.* at 4. By no means does this represent a clear statement of an intent to impose strict liability. But the Court finds that this statement provides slight evidence that Congress intended to, or at least recognized that, the amendment would make violations of 16 U.S.C. § 668dd easier to prosecute. And one of the justifications for imposing strict liability is ease of prosecution of small regulatory crimes. *See Morissette*, 342 U.S. at 263.

Overall, the Court finds that the legislative history of § 668dd(f)(2) does not indicate a clear intent to impose strict criminal liability. Nor does it include a clear indication of

---

[19] The complete explanation of the amendment to the violation provision stated:

> Section 6 reduces the penalty for unintentionally committed violations of the National Wildlife Refuge System Administration Act of 1966 (the Act). Currently, all violations are Class A misdemeanors with a maximum prison sentence of one year. This section lowers the penalty for unintentional violations (those not "knowingly" committed) to a Class B misdemeanor, with a maximum prison sentence of 180 days. Unlike Class B misdemeanors, Class A misdemeanors would require a showing that the person acted "knowingly," that is, acted voluntarily and intentionally, not through ignorance, mistake, or accident. The "knowingly" requirement, however, does not require proof that the person acted with knowledge that his or her acts were unlawful.

S. Rep. 105-310, at 2–3 (1998).

Congressional intent to impose a mental state element. Unlike the courts that decided *Best*, *Kenner*, and *Mast*, the Court does not find this fact dispositive of the strict liability issue, especially considering the Senate report's discussion of making unintentional violations easier to prosecute. *See Staples*, 511 U.S. at 618. Instead, the Court finds this factor to be inconclusive.

> 6. *Section 668dd(f)(2) creates a regulatory public welfare offense because it does not codify a common-law crime and imposes a small penalty.*

Beyond the text of the statute and its legislative history, the Court looks to the character and context of the offense at issue to determine whether it includes a mental state element. *See Rehaif*, 588 U.S. at 225. As discussed above, the court specifically examines whether the offense is part of a regulatory or public welfare program, whether it would criminalize a broad range of apparently innocent conduct, and the penalty imposed for violating the statute. *See supra* Section I.B.1.

### a. Public Welfare Offenses

The Court begins this stage of the analysis by examining whether the statute is part of a regulatory or public welfare program. *See Rehaif*, 588 U.S. at 232. Blow argues that strict criminal liability is limited to those offenses that fit within the Supreme Court's "public welfare doctrine," and claims that the offenses described by that doctrine "almost invariably relates to potentially dangerous items, such as automobiles, drugs, alcohol, destructive devices, or any other items that could harm 'public welfare.'" ECF No. 10 at 3. Because neither Title 4, Virginia Administrative Code § 15-50-60, nor 50 C.F.R. 32.2(d), nor § 668dd(f)(2) regulate "dangerous and deleterious devices," Blow contends the public welfare doctrine does not apply in this case, and § 668dd(f)(2) does not impose strict criminal liability. *Id.* at 4 (quoting *Staples*, 511 U.S. at 607).

Blow is essentially arguing that the public welfare doctrine stands for the following proposition: only offenses related to dangerous or heavily regulated substances or objects, like

drugs or weapons, can impose strict liability. This is wrong for two reasons. First, it is unclear whether the public welfare doctrine is limited to dangerous and deleterious devices. It is true that the Supreme Court has often discussed the "public welfare" doctrine of strict liability offenses in the context of inherently dangerous items, like guns, hand grenades, and narcotics.[20] But a close reading of *Staples* suggests that offenses related to "potentially harmful or injurious items" are a category of public welfare offenses, but not the only type of offense that fits within that doctrine. *See Staples*, 511 U.S. at 607 ("*Typically*, our cases recognizing such offenses involve statutes that regulate potentially harmful or injurious items.") (emphasis added). In *Staples*, the Court cited *Commonwealth v. Raymond*, 97 Mass. 567 (1867), as a case that "first defined the concept of the public welfare offense." In *Raymond*, the Court held that the government need not prove that the defendant knew that a calf was less than four weeks old to be charged with illegally killing a calf less than four weeks old.[21] *Id.* at 569–70. The Supreme Court also cited, in a footnote in *Staples*, the following explanation of public welfare offenses from then-Judge Blackmun:

> [W]here a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent.

---

[20] This is probably because several of the Supreme Court's strict liability-focused opinions dealt specifically with statutes that regulated guns and other weapons. *Staples*, 511 U.S. at 602 (firearms); *Rehaif*, 588 U.S. at 227 (same); *Freed*, 401 U.S. at 607 (hand grenades).

[21] *See also Morissette*, 342 U.S. at 253–59 (discussing the history of public welfare offenses, including those that are primarily related to regulatory goals). In *Shevlin-Carpenter Co. v. State of Minnesota*, the Court upheld the constitutionality of a state law that imposed strict criminal liability and made it a felony to illegally cut timber. 218 U.S. 57, 70 (1910). In that case, the Court referenced the connection of public welfare to strict liability. *Id.* at 68; *See United States v. Cordoba-Hincapie*, 825 F. Supp. 485, 506 (E.D.N.Y. 1993).

*Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960) (Blackmun, J.); *Staples*, 511 U.S. at 618 n.15.[22]  And in *Morissette*, the Court described the public welfare doctrine in terms of the penalty it imposed, not the conduct or substance it regulated.  342 U.S. at 256.  Moreover, later cases suggest that offenses that are essentially regulatory in nature may fit within the public welfare doctrine. *See Rehaif*, 588 U.S. at 232 ("[W]e have typically declined to apply the presumption in favor of scienter in cases involving statutory provisions that form part of a 'regulatory' or 'public welfare' program . . . ."); *Apollo Energies*, 611 F.3d at 686.

Second, to hold that only offenses that relate to inherently dangerous objects or activities may impose strict liability contradicts the cases, discussed above, that interpreted misdemeanor violations of the MBTA to impose strict criminal liability. *See supra* Section I.B.4.  In several of those cases, the Courts of Appeal specifically recognized that those offenses created via statute to enforce a regulatory goal may impose strict liability without contradicting Supreme Court precedent. *See Engler*, 806 F.2d at 431 ("The Supreme Court, however, has long recognized that a different standard applies to those federal criminal statutes that are essentially regulatory, that are designed to protect the public welfare, and that do not have their origins in the common law.").  Therefore, the Court declines to find that the public welfare doctrine applies solely to dangerous conduct.

Instead, the Court finds that § 668dd(f)(2) falls in the other category of strict liability offenses mentioned in discussions of the public welfare doctrine: those that are essentially

---

[22] The debate over public welfare offenses, specifically, and strict liability, broadly, often raise the question of whether a lack of a mental state element in a particular crime creates due process concerns. *See Freed*, 401 U.S. at 601; *Shevlin-Carpenter*, 218 U.S. at 70; *Cordoba-Hincapie*, 825 F. Supp. at 515.  Blow does not make that argument here, and because the Supreme Court has recognized that strict liability statutes may be adopted without violating due process, the Court assumes without deciding that interpreting § 668dd(f)(2) to impose strict criminal liability does not create due process concerns. *Shevlin-Carpenter Co.*, 218 U.S. at 70.

regulatory in nature, that do not simply codify common law crimes, and those that impose light penalties.[23] In *Morissette*, the Court recognized that public welfare offenses generally "do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals." 342 U.S. at 255. The Court therefore contrasts statutes creating a regulatory, public-welfare offense with those statutes that merely adopted a common law crime. *See Staples*, 511 U.S. at 618 (discussing the difference between common-law crimes and public welfare offenses) (citing *Morissette*, 342 U.S. at 256). Later cases continue to ask whether a criminal statute is part of a regulatory or public welfare scheme, as opposed to a mere adoption of a common law crime, when determining whether a statute imposes strict criminal liability. *See Rehaif*, 588 U.S. at 232 ("The firearms provisions before us are not part of a regulatory or public welfare program, and they carry a potential penalty of 10 years in prison that we have previously described as 'harsh.'"). Circuit courts found this distinction meaningful, and held that the MBTA, drawn from international treaties to carry out a regulatory goal instead of a codifying a common-law crime, qualified as a regulatory offense that could impose strict liability. *See Engler*, 806 F.2d at 432 ("As noted above, the MBTA is a regulatory measure designed to protect the public welfare, derived not from the common law but from a series of treaties with other states.").

---

[23] In *Staples*, the Court cited Harvard Law School Professor Francis Bowes Sayre's article *Public Welfare Offenses* to explain the general concept of the public welfare offense. *See Staples*, 511 U.S. at 617; Francis Bowes Sayre, *Public Welfare Offenses*, 33 Colum. L. Rev. 55 (Jan. 1933). The Court cited the same article several times in *Morissette*. 342 U.S. at 253 n.11. In the article, Professor Sayre proposes a list of categories of public welfare offenses. Sayre, *supra*, at 73. One category is "Violations of general police regulations, passed for the safety, health or well-being of the community." *Id.* The article specifically lists game laws as part of this category and cites several cases in which strict criminal liability was imposed when a defendant violated game laws. *Id.* at 87–88 (citing *Haggerty v. St. Louis Ice Mfg. & Storage Co.*, 44 S.W. 1114, 1116 (Mo. 1898); *State v. Cherry Point Fish Co.*, 130 P. 499, 502 (Wash. 1913)).

Section 668dd(f)(2) does not codify a specific common-law felony; it is part of a larger statutory scheme that dictates how the National Wildlife Refuge System is managed. *See* §§ 668dd–668ee.[24] Section 668dd specifically contemplates that the Fish and Wildlife Service will issue regulations to carry out the statute's purpose, which is to govern the management of the National Wildlife Refuge System. § 668dd(b)(5). Thus, it is clearly part of a "regulatory or public welfare program," and therefore more likely to impose strict criminal liability. *Rehaif*, 588 U.S. at 232.

### b. Penalties

This understanding of § 668dd(f)(2) is further bolstered by the relatively light penalties it imposes. As discussed above, *see* Section I.B.1, strict liability offenses usually impose relatively light penalties. *See Staples*, 511 U.S at 616 ("Historically, the penalty imposed under the statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea*."). The Supreme Court has not offered a firm rule as to what constitutes a "light" penalty. *Id.* The lowest potential penalty it has labelled as too harsh to support a finding of strict liability appears to be a maximum fine of $100,000 or imprisonment for up to three years, or both. *U.S. Gypsum Co.*, 438 U.S. at 442 n.18. And the Supreme Court has generally expressed reluctance to find that felonies are strict liability offenses. *See Morissette*, 342 U.S. at 260; *Staples*,

---

[24] Congress described the purpose of § 668dd as follows:

> For the purpose of consolidating the authorities relating to the various categories of areas that are administered by the Secretary for the conservation of fish and wildlife, including species that are threatened with extinction, all lands, waters, and interests therein administered by the Secretary as wildlife refuges, areas for the protection and conservation of fish and wildlife that are threatened with extinction, wildlife ranges, game ranges, wildlife management areas, or waterfowl production areas are hereby designated as the "National Wildlife Refuge System" (referred to herein as the "System"), which shall be subject to the provisions of this section, and shall be administered by the Secretary through the United States Fish and Wildlife Service.

16 U.S.C.A. § 668dd(a)(1).

511 U.S. at 618. Offering some potential historical context for what constitutes a "light" penalty, in *Staples*, the Court recognized that "the cases that first defined the concept of the public welfare offense almost uniformly involved statutes that provided for only light penalties such as fines or short jail sentences, not imprisonment in the state penitentiary." 511 U.S. at 616.

The Court finds that the sentenced imposed by § 668dd(f)(2)—a fine of up to $5,000 or six months imprisonment, or both and a ten-dollar special assessment—is comparatively light, and therefore supports a finding that the statute imposes strict criminal liability. *See* 18 U.S.C. § 3571(b)(6). The limited precedent on what constitutes a light penalty supports this reading. One of the cases the Supreme Court cited in *Staples* to demonstrate that the earliest strict liability offenses imposed light penalties was, again, *Raymond*, where the offense at issue imposed a penalty of a $200 fine, a six-month jail sentence, or both. 97 Mass. at 567 n.a1; *Staples*, 511 U.S. at 616. And the penalty at issue here is nowhere close to the multi-year prison sentences imposed by the felonies at issue in, for example, *Staples*, 511 U.S. at 618, and *Rehaif*, 588 U.S. at 227.

Additionally, the misdemeanor provision of the MBTA, discussed above, imposes an even greater penalty—a maximum sentence of six months in jail and/or a maximum fine of $15,000—than the one at issue here. 16 U.S.C. § 707(a). In their analysis of the misdemeanor provision of the MBTA, Courts have held that the penalties imposed by that statute are light enough to be "consistent with a strict liability standard." *Morgan*, 311 F.3d at 616. Considering the Supreme Court's discussion of light penalties and the Courts of Appeals' analysis of the MBTA, the Court finds that § 668dd(f)(2) imposes a penalty consistent with a strict liability standard.

### c. Innocent Conduct

After considering § 668dd(f)(2)'s place in the public welfare doctrine and the penalties it imposes, the Court turns to the final step in this analytical framework and asks whether interpreting

§ 668dd(f)(2) to impose strict criminal liability would "criminalize a broad range of apparently innocent conduct." *Staples*, 511 U.S. at 610 (quoting *Liparota*, 471 U.S. at 426). This step in the analysis focuses primarily on whether the conduct at issue puts the individual on notice of the possibility of strict regulation or penalties. *See Staples*, 511 U.S. at 601.

The parties did not fully brief the question of whether interpreting § 668dd(f)(2) to impose strict criminal liability risks punishing innocent conduct. *See* ECF Nos. 10, 11. Section 668dd(f)(2) applies to many other statutory provisions and regulations. Section 668dd(c) makes it a criminal offense to, within the boundaries of a national wildlife refuge, "disturb, injure, cut, burn, remove, destroy, or possess any real or personal property of the United States," "take or possess" wildlife and/or their nests, or "enter, use, or otherwise occupy" an area within a national wildlife refuge without authorization. At the same time, § 668dd(f)(2) also provides the penalty for regulations promulgated pursuant to § 668dd. This breadth of application makes the statute different from those interpreted in, for example, *Staples*, 511 U.S. at 602, or *Liparota*, 471 U.S. at 420, where the statutes applied to a specific, wrongful act and the inquiry focused only on the statute itself. Determining whether a strict liability interpretation would criminalize innocent conduct requires the Court to examine the application of the law, including in hypothetical situations. *See Staples*, 511 U.S. at 614–15; *Liparota*, 471 U.S. at 427–28.

The only other court to address the "innocent conduct" prong of the strict liability analysis is the Eighth Circuit in *Mast*. 938 F.3d at 977. There, the Court specifically noted that "[u]nless Mast knew or should have known that carrying out a drainage project on his own land would

40

disturb NWRS property, his conduct was innocent." *Id.* The Court looks, as the Court in *Mast* did, to the specific conduct at issue here.[25]

It is not clear that interpreting § 668dd(f)(2) to impose strict criminal liability for violations of 50 CFR § 32.2 poses a risk of punishing innocent conduct. Again, in determining whether a strict liability interpretation would punish otherwise innocent conduct, the Supreme Court focuses its analysis on whether the conduct itself gives an individual notice of the possibility of strict regulation. *See Staples*, 511 U.S. at 601. A person who complies with the licensing and permitting requirements for hunting on a national wildlife refuge is automatically informed of the existence of regulation.[26] Blow attached to his memorandum the permit he received for hunting black bear in the Great Dismal Swamp National Wildlife Refuge. ECF No. 10, attach. 1. That permit came with "a 2024 hunt brochure with regulations and hunt unit map," which appears to include a table summarizing the applicable federal regulations that specifically cites to Title 50 of the Code of Federal Regulations. *Id.* at 1–2. Blow also told a law enforcement officer that he reviewed a webpage from the Virginia Department of Wildlife Resources discussing Virginia's bear hunting regulations and the prohibition on harvesting a female bear accompanied by a cub. *See* ECF No. 8, attach. 1. And hunters are required to report each bear kill directly to the government as soon as they are able. 4 Va. Admin. Code § 15-40-290.[27] Beyond the fact that hunters must be licensed

---

[25] Of course, the Court does not evaluate § 668dd(f)(2)'s application to the specific offense in *Mast*, it only follows the Eighth Circuit's interpretive decision to analyze the "innocent conduct" prong of the strict liability analysis in the context of the violation itself. *See Mast*, 938 F.3d at 977.

[26] The Court in *Rehaif* held that "[a]ssuming compliance with ordinary licensing requirements, the possession of a gun can be entirely innocent." 588 U.S. at 232. The Court likewise assumes that, even though hunting may be an innocent act, hunters comply with licensing requirements, as Blow did, for the purpose of this analysis. *See* ECF No. 10 attach. 1.

[27] In *Staples*, the Supreme Court noted that "regulation in itself" did not put gun owners on notice of the possibility of regulation. 511 U.S. at 613. "[I]n the vast majority of States, buying a shotgun or rifle is a simple transaction that would not alert a person to regulation any more than would buying a car," and the Court noted that in many states, an individual could purchase a weapon with proof of identification and, in

to hunt on a national wildlife refuge in the first place, the myriad of regulations explained and cited in the license itself is enough to put them on notice of the possibility of strict regulation from both the state and federal governments. *See id.*

Section 668dd(f)(2) is, again, a broadly applicable statute, and the parties did not address its application to other provisions of § 668dd and the regulations issued thereunder. *See* ECF Nos. 10–11. But because the parties have not briefed the matter, and in light of the analysis above, the Court is not persuaded that interpreting § 668dd(f)(2) to impose strict criminal liability risks sweeping apparently innocent conduct into the statute's range.

### 7. Taken together, these factors rebut the presumption of scienter and demonstrate congressional intent to make § 668dd(f)(2) impose strict criminal liability.

The goal of this analysis is to determine whether § 668dd(f)(2) imposes strict criminal liability for unknowing violations of 16 U.S.C. § 668dd. *See supra* Section I.B.1. The text of the statute does not plainly state that the offense contains a mental state element, so the presumption of scienter applies. *Id.* Because "a legislative body may enact a valid criminal statute with a strict-liability element, the dispositive question is whether it has done so or, in other words, whether the presumption [of scienter] is rebutted." *Rehaif*, 588 U.S. at 258 (Alito, J., Dissenting). Statutory text or other persuasive factors may rebut the presumption. *Id.* (citing *Liparota*, 471 U.S. at 425; *X-Citement Video*, 513 U.S. at 70–72; *Flores-Figueroa*, 556 U.S. at 652 (Alito, J., concurring in part and concurring in the judgment).

Because ample persuasive evidence exists to suggest that Congress intended § 668dd(f)(2) to impose strict criminal liability, the Court finds that the presumption of scienter has been

---

some cases, a simultaneous application for a permit. *Id.* at 614, 614 n.9. Here, however, the regulations governing hunting on a national wildlife refuge and in Virginia are more pervasive. Specific permits apply to different animals, and the hunter must inform state officials every time he records a kill. *See* ECF No. 8, attach. 1; 4 Va. Admin. Code § 15-40-290. This provides a different level of notice of the potential for regulation than merely purchasing a weapon.

rebutted. The Court finds the limited precedent from this Court and the Eastern District of North Carolina finding that § 668dd(f)(2) imposes strict liability to be persuasive but not dispositive. *Supra* Section I.B.2. Moving on to the text of the statute, the Court finds the absence of a mental state element in the text of the statute to be persuasive, but not dispositive, evidence of Congress's intent to impose strict liability. *Supra* Section I.B.3.   Because the text of the statute itself does not clearly answer the question, however, the Court looks to additional evidence of Congressional intent. *Id.* The Court finds the long chain of precedent interpreting the misdemeanor provision of the MBTA to impose strict liability to be highly persuasive, especially because of the textual similarities between § 668dd(f)(2) and § 707. *Supra* Section I.B.4. And the Court finds that the regulatory purpose and context of § 668dd(f)(2) as well as the relatively small penalty it imposes present persuasive evidence in rebuttal of the presumption of scienter. *Supra* Section I.B.6.

The Court finds that the legislative history of the statute is inconclusive and only demonstrates that Congress intended to separate the penalties for knowing and unknowing violations of § 668dd(f)(2). *Supra* Section I.B.5. The Court also finds that, although a strict liability reading of § 668dd(f)(2) does not risk penalizing innocent conduct in this case, the statute's broad applicability, and the parties' lack of briefing on that issue, also renders that factor inconclusive. *Supra* Section I.B.6.

Thus, considering all the above factors, the Court finds that the analysis described sufficiently establishes Congressional intent to impose strict liability, so to convict Blow pursuant to § 668dd(f)(2), the Government need not prove that he violated a state hunting regulation in violation of 50 C.F.R. 32.2(d) either negligently, recklessly, knowingly, or purposefully. It only needs to prove that he violated the state hunting regulation.

### C. Title 4, Virginia Administrative Code § 15-50-60 imposes strict criminal liability for the killing of a female bear accompanied by a cub.

The Court now turns to the second mental state question presented by this case: whether, to convict Blow, the government must prove that he either recklessly or negligently killed a female bear accompanied by a cub in violation of § 15-50-60 of Title 4 of the Virginia Administrative Code. In other words, the Court is again tasked with determining whether a law, this time appearing in the form of a state regulation, imposes strict criminal liability.

Blow argues it does not.[28] He claims that the Government must prove that he either recklessly or negligently[29] killed a female bear accompanied by a cub to convict him under § 15-50-60. In doing so, he makes many of the same arguments presented above. He claims that strict liability offenses are generally disfavored, the presumption of scienter applies, § 15-50-60 does not create a public welfare offense, and there is no evidence of legislative intent to make § 15-50-60 a strict liability crime. ECF No. 10 at 2–5.

The Government argues that § 15-50-60 does impose strict liability. It recounts a general history of strict liability offenses and then offers the following application of that history to § 15-50-60:

> The regulation involved in the instant case falls squarely within the category of regulatory crimes for which no knowledge or intent is required. It is not derived from common law; there is no intent or knowledge requirement contained within the regulation itself; its purpose is that cubs not be orphaned in order that they survive, therefor, the injury is the same regardless of the hunter's intent; that purpose would be easily thwarted by reading knowledge or intent into the regulation, as it would make the regulation almost impossible to enforce – all a

---

[28] At trial, Blow did not dispute that he voluntarily shot the bear or that he did not intend to shoot the bear. His strict liability argument focuses only on his contention that he did not "know the facts that make his conduct illegal." *Staples*, 511 U.S. at 619.

[29] In his brief, Blow did not specify whether he believes § 15-50-60 should impose a negligent or reckless *mens rea*. ECF No. 10 at 5 ("Accordingly, in order to prove its case, the Government's evidence must prove beyond a reasonable doubt that the defendant possessed a general criminal intent, such as recklessness.").

> defendant need say is that they did not know and did not intend to orphan a cub; it
> is not a crime of moral turpitude; the penalty is viewed as small under federal law;
> and the penalty structure itself clearly contemplates unknowing violations.

ECF No. 11 at 5. The parties fail to recognize that this part of their dispute requires the Court to

interpret state, not federal, law. Thus, the Court will address this problem first before determining

whether § 15-50-60 imposes strict criminal liability.

### 1. The Court is tasked with interpreting a Virginia state regulation, so Virginia law applies.

Determining whether § 15-50-60 imposes strict criminal liability requires the Court to

interpret a state regulation. Federal courts are rarely tasked with interpreting state criminal laws,

let alone state regulations in the criminal context. But the Court "regularly interprets Virginia law

and must 'decide questions of state law, even if difficult and uncertain, when necessary to render

judgment.'" *Burke v. THOR Motor Coach, Inc.*, 113 F. Supp. 3d 863, 866 (E.D. Va. 2015) (quoting

*Legard v. EQT Prod. Co.*, 771 F.Supp.2d 607, 609 (W.D. Va. 2011)). Doing so is necessary here

because Blow is charged with violating 50 C.F.R. 32.2(d), which makes it a federal offense to

violate state hunting laws while on a national wildlife refuge. Thus, to convict Blow of violating

50 C.F.R. 32.2(d), the Government must prove that he violated § 15-50-60 by killing a female bear

accompanied by a cub. Blow argues that § 15-50-60 contains a mental state element, and to

evaluate that argument, the Court must interpret § 15-50-60. ECF No. 10 at 2.

When interpreting a Virginia statute or regulation, the Court must apply Virginia law and

determine how the Supreme Court of Virginia would rule if it were to decide the same issue.

*United States v. Edwards*, 128 F.4th 562, 565 (4th Cir. 2025) ("When interpreting a North Carolina

statute, we apply North Carolina law and determine how the Supreme Court of North Carolina

would rule were it to decide this case.") (quoting *Currituck Cnty. v. LeTendre*, 102 F.4th 252, 259

(4th Cir. 2024)); *United States v. Vann*, 660 F.3d 771, 777 (4th Cir. 2011) ("[A]s a federal court

evaluating a state offense, we are 'bound by the [state supreme court's] interpretation of state law, including its determination of the elements of' the offense.") (quoting *Johnson v. United States*, 559 U.S. 133, 138 (2010)).  The Court is unaware of any state court opinion that addresses whether § 15-50-60 contains a mental state element, so it must use the Supreme Court of Virginia's methodology to interpret the regulation.  *Edwards*, 128 F.4th at 565.  The Fourth Circuit instructs that federal courts should interpret Virginia regulations according to the methodology adopted by the Virginia Supreme Court.[30]  *Lumumba v. Kiser*, 116 F.4th 269, 280 n.9 (4th Cir. 2024) (citing *Chesapeake Hosp. Auth. v. State Health Comm'r*, 872 S.E.2d 440, 446 (2022)).  Additionally, the Court uses the Supreme Court of Virginia's rules of construction when interpreting Virginia statutes.  *Est. Const. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 218 (4th Cir. 1994).  The Court also looks to Supreme Court of Virginia doctrinal precedent when interpreting Virginia statutes.  *See United States v. Adams*, 426 F.3d 730, 731 n.* (4th Cir. 2005) (Interpreting a Virginia criminal statute pursuant to Supreme Court of Virginia precedent).  And "[w]hen the highest court of a state has not indicated how it would decide an issue, [the Court follows] the law of intermediate state courts . . . absent 'persuasive data' that the highest court would rule differently." *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 484 (4th Cir. 2018); *Colorado Bankers Life Ins. Co. v. Acad. Fin. Assets, LLC*, 60 F.4th 148, 154 (4th Cir. 2023) (holding that, in the absence of clear precedent from a state supreme court, decisions of intermediate appellate courts "constitute

---

[30] In *Lumumba v. Kiser*, the Fourth Circuit was tasked with interpreting Offense Code 128 of the Virginia Department of Correction's Operating Procedure, which was "promulgated under the Director of Correction's rulemaking authority."  116 F.4th 269, 280 n.9 (4th Cir. 2024).  The court recognized that "Virginia courts interpret state regulations according to their plain meaning when they are unambiguous. . . . So we do the same here." *Id.*  Unlike in that case, and many other cases in which the Virginia courts interpret agency regulations, this case does not present an appeal from an adverse agency decision or involve an agency's interpretation of its own regulations. *See id.* at 278.

the next best indicia" of how to interpret state law but are never binding) (quoting *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs.*, Inc., 296 F.3d 308, 312 (4th Cir. 2002).

The Fourth Circuit's analysis in *United States v. Adams* provides a helpful framework for interpreting a state criminal law made applicable to federal lands through regulation promulgated by the Department of the Interior. 426 F.3d at 731–33. In that case, the defendant was convicted of driving while his license was revoked and driving as a habitual offender under Virginia law while driving in the Great Dismal Swamp National Wildlife Refuge. *Id.* at 731. The Court recognized that, pursuant to the Assimilative Crimes Act, 18 U.S.C. § 7, 13(a), and 50 C.F.R. § 27.31(a), a regulation promulgated by the Fish and Wildlife Service, state law governs traffic safety and the permissible use and operation of vehicles within the national wildlife refuges. *Id.* at 731 n.*.

The Defendant's argument required the Court to interpret the term "highway" as it was used in the two Virginia statutes under which he was charged. *Id.* at 731. The Court interpreted that term pursuant to Supreme Court of Virginia precedent. *Adams*, 426 F.3d at 732. The Court also recognized its role in interpreting a state criminal statute:

> Having now confronted on more than one occasion the question of whether a particular road comes within Virginia's definition of "highway," we understand the difficulties that attend interpretation of Va. Code § 46.2 and the consequent uncertainties that result from its attempted application. Our responsibility as a court and as a federal court, however, is limited to interpreting, to the best of our ability, the statute as it was enacted and as it has been construed by the courts of Virginia. If the need exists for changes in the reach or clarity of the statute, that need is properly addressed to the legislature of the Commonwealth.

*Id.* at 732–33. The Court believes it bears the same responsibility in answering this interpretive question. The parties assume that the Court will interpret § 15-50-60 and any other question of Virginia law according to federal precedent. ECF No. 10 at 2–5; ECF No. 11 at 1–7. While the Supreme Court of the United States' analysis of strict liability crimes is certainly relevant, the

Court is tasked with interpreting a state regulation.  Thus, the Court derives its overall interpretive

framework in this instance from Supreme Court of Virginia precedent.

### 2. Virginia Courts impose strict liability when statutory language and legislative purpose demonstrate an intent to leave a mental state element out of the statute.

The Supreme Court of Virginia instructs that, in interpreting a statute, the primary objective

is to "'ascertain and give effect to legislative intent,' as expressed by the language used in the

statute." *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 722 S.E.2d 626, 629 (Va. 2012).  The

Court "examine[s] a statute in its entirety, rather than by isolating particular words or phrases,"

and the "plain, obvious, and rational meaning of a statute is always to be preferred to any curious,

narrow, or strained construction." *Cummings v. Fulghum*, 540 S.E.2d 494, 496 (Va. 2001); *Turner

v. Commonwealth*, 309 S.E.2d 337, 338 (Va. 1983).  The Court interprets related statutes in

tandem, and when the legislature uses one term in one section of a statute but omits it in another,

the omission is presumed to be intentional. *Indus. Dev. Auth. of City of Roanoke v. Bd. Of Sup'rs,

Montgomery Cnty.*, 559 S.E.2d 621, 623 (Va. 2002).  When the meaning of a statute is ambiguous,

the Court may turn to legislative history to determine legislative intent. *Graves v. Commonwealth*,

805 S.E.2d 226, 229 (Va. 2017).

Crucially, Virginia courts recognize that the principles of statutory construction apply to

the interpretation of regulations adopted by an administrative agency.  *Avalon Assisted Living

Facilities, Inc.*, 574 S.E.2d 298, 307 (Va. App. 2002) (Finding, after discussing several rules of

statutory interpretation, "no reason not to apply these same rules to the interpretation of regulations

adopted by an administrative agency pursuant to statutory authority granted it by the legislature");

*Horne v. Commonwealth Real Estate Bd.*, 705 S.E.2d 535, 539 (Va. App. 2011);  *Finch v. Dept.

of Pro. and Occupational Reg., Real Estate Bd.*, 2019 WL 921152, at *3 (Va. App.  2019)

(unpublished).  Although the Supreme Court of Virginia often interprets regulations on appeal

from a specific state agency's decision, the Court analyzes a regulatory provision according to its plain language when it is unambiguous. *Chesapeake Hosp. Auth. v. State Health Comm'r*, 872 S.E.2d 440, 446 (Va. 2022).[31]

The Supreme Court of Virginia and the Court of Appeals of Virginia have applied these principles in several cases involving the question of whether a criminal statute imposed strict criminal liability. As an initial matter, "Virginia permits the creation of strict liability offenses 'and there is no constitutional requirement that an offense contain a *mens rea* or scienter element.'" *Imaginary Images Inc. v. Evans*, 593 F. Supp. 2d 848, 862 (E.D. Va. 2008), *aff'd*, 612 F.3d 736 (4th Cir. 2010) (quoting *Maye v. Commonwealth*, 189 S.E.2d 350, 351 (Va. 1972) (per curiam)).

In *United States v. Ritter*, the Supreme Court of Virginia held that a statute criminalizing the possession of a narcotic drug included a mental state element even though the text of the statute did not support one. 173 S.E.2d 799, 805–06 (Va. 1970) ("[I]t generally is necessary to show that defendant was aware of the presence and character of the particular substance and was intentionally and consciously in possession of it."). Addressing the concept of strict liability more explicitly two years later in *Maye*, the Supreme Court of Virginia held that "[a] claim that a statute on its face contains no requirement of *mens rea* or Scienter is no ground for holding the statute unconstitutional since such requirement will be read into the statute by the court when it appears the legislature implicitly intended that it must be proved." 189 S.E.2d 350, 351 (Va. 1972) (citing *Morissette*, 342 U.S. at 250; *United States v. Johnson*, 419 F.2d 56, 60 (4th Cir. 1969), cert. denied, 397 U.S. 1010). In *Maye*, the Court held that a statute criminalizing grand larceny after bailment did not violate the Virginia Constitution because the legislature implicitly meant to include an

---

[31] Here, of course, there is no agency interpretation of § 15-50-60 to which the Court must defer. Blow does not appeal from an administrative decision, and neither the Court nor the parties found any interpretation of § 15-50-60 from Virginia agencies.

intent element in the statute. *Id.* at 351. Conversely, in *Makarov v. Commonwealth*, the Court held that a statute that criminalized failure to pay employees included no mental state element and therefore violated Virginia's prohibition on imprisoning a defendant for failure to pay a debt. 228 S.E.2d 573, 575–76 (Va. 1976). The Court held that, unlike in *Maye*, no evidence suggested a legislative intent to impose a mental state element in the statute. *Id.*

In *Esteban v. Commonwealth*, The Supreme Court of Virginia found that Virginia Code § 18.2-308.1 imposed strict criminal liability on a defendant who contended that she accidentally and unknowingly brought a gun to the elementary school where she worked. 587 S.E.2d 523, 525 (Va. 2003). The defendant cited *Staples*, 511 U.S. at 605, in arguing that the court should read a mental state element into the statute at issue because "the requirement of some *mens rea* for a crime was deeply embedded in the common law." *Id.* at 525. The Court rejected this argument and first noted that the crime at issue is a "purely statutory offense." *Id.* at 526. And the Court specifically held that "courts construe statutes and regulations that make no mention of intent as dispensing with it and hold that the guilty act alone makes out the crime." *Id.* (Citing *Morissette*, 342 U.S. at 246, 256, 258; *Makarov*, 228 S.E.2d at 575–76).

The Court then examined the legislative intent behind the enactment of § 18.2-30. It noted that "[a] statute must be construed with reference to its subject matter, the object sought to be attained, and the legislative purpose in enacting it; the provisions should receive a construction that will render it harmonious with that purpose rather than one which will defeat it." *Id.* (citing *Stanley v. Tomlin*, 129 S.E. 379, 382 (Va. 1925)). Considering only the statutory language, the Court held that the purpose of the statute is to "criminalize the introduction of firearms into a school environment." *Id.* And because reading a mental state element into the statute when the language did not support one would "defeat" this purpose, the Court refused to do so. *Id.*

Thereafter, Virginia courts and this Court looked to *Esteban* when interpreting Virginia statutes and when determining whether specific criminal offenses imposed strict liability.[32]  In *Herron v. Commonwealth*, the Virginia Court of Appeals held that Virginia Code § 53.1–203(5), which makes it unlawful for any prisoner in a correctional facility to possess a chemical compound not lawfully received, imposes strict criminal liability.  688 S.E.2d 901, 904–05 (Va. App. 2010).  Following *Esteban*'s guidance, the Court defined the purpose of the statute as promoting the rehabilitation and health of prisoners while maintaining the safety of those who work in the prison.  *Id.* at 904–05.  Then, the Court emphasized that "omitted terms were not intended to be included within the scope of the statute."  *Id.* at 904.  The Court ultimately held that the Commonwealth need not prove that the Defendant intended to bring drugs into a correctional facility to convict him under Virginia Code § 53.1–203(5).  *Id.* at 904–05.

The Court reiterated its strict-liability interpretation of Virginia Code § 53.1–203(5) in *Clayton v. Commonwealth.*  877 S.E.2d 504, 507–08 (Va. App. 2022).  In that case, the defendant argued that *Herron* did not apply to his prosecution pursuant to § 53.1–203(5) because in that case, the Court defined the legislative intent of the statute as preventing the introduction of controlled substances into correctional facilities.  *Id.* at 506–07.  The defendant argued that this intent did not apply to his offense because he did not introduce a controlled substance to the correctional facility in which he was housed, he obtained the unlawful chemical compound inside the facility.  *Id.* at 506–07.  The Court held that the "danger that Code § 53.1–203(5) seeks to prevent is not simply

---

[32] *See Level 3 Commc'ns, LLC v. Webb, Inc.*, No. 3:12CV82, 2012 WL 2199262, at *4 (E.D. Va. June 14, 2012) (quoting *Esteban*, 587 S.E.2d at 526) (discussing *Esteban*'s instruction to "construe statutes and regulations that make no mention of intent as dispensing with it" in the context of a tort claim); *United States v. Barber*, 360 F. Supp. 2d 784, 787 (E.D. Va. 2005) (quoting *Esteban*, 587 S.E.2d at 526) (interpreting a Virginia criminal statute according to *Esteban*'s emphasis on legislative intent and purpose).

the 'introduction' of unlawful substances to the correctional facility," but also their presence in the correctional facility.  *Id.* at 507.  Additionally, the Court held that it was bound by both *Herron* and *Esteban* to find that § 53.1–203(5) imposes strict criminal liability.  *Id.* at 507–08.

Judge Raphael filed a concurring opinion in *Clayton* and agreed that *Herron* controlled the Court's resolution of the § 53.1–203(5) interpretation issue.  877 S.E.2d at 508.  However, his concurrence is instructive in this case because it recognizes Virginia's unique approach to strict liability offenses with a focus on *Esteban* and urges the Supreme Court of Virginia to revisit its reasoning in *Esteban* when confronted with the proper case.  *Id.* at 514.  "*Esteban* did not address whether and when courts should apply a presumption of *mens rea* when a statutory offense fails to specify a state-of-mind requirement.  By not requiring a presumption of *mens rea* for statutory felonies, *Esteban* appears to make Virginia an outlier compared to other jurisdictions."  *Id.* at 508.

After examining the development of the federal presumption of scienter, Judge Raphael noted that the Supreme Court of Virginia, unlike other state courts, failed to apply that presumption in *Esteban* even though the offense carried a maximum sentence of up to five years of incarceration.  *Id.* at 512–13.  Judge Raphael also emphasized that despite holding that "courts construe statutes and regulations that make no mention of intent as dispensing with it and hold that the guilty act alone makes out the crime," the Court in *Esteban* held that determining whether a statute imposes strict liability involves a "case-by-case" approach that emphasizes statutory purpose.  *Id.* at 512.

Finally, in *Camann v. Commonwealth*, the Virginia Court of Appeals held that the government needed to prove that the defendant knew that a single mixture in his possession contained two controlled substances to convict him under Virginia Code § 18.2-250.  No. 0243-22-4, 2023 WL 2246635, at *4 (Va. Ct. App. Feb. 28, 2023) (unpublished), *reh'g en banc granted,*

52

*mandate stayed*, 896 S.E.2d 370 (2024). That statute makes it unlawful "for any person to knowingly or intentionally [] posess a controlled substance" without a prescription. Va Code Ann. § 18.2-250. The Court emphasized the statute's inclusion of the term "knowingly or intentionally" as evidence of legislative intent to make knowledge of both substances essential, and cited *Ritter's* inclusion of a *mens rea* requirement in the statute even before the "knowingly or intentionally" language was added to it. *Camann*, 2023 WL 2246635, at 9–11. The Court of Appeals held that the Supreme Court of Virginia recognized the presumption of scienter "implicitly" in *Ritter* and applied that presumption to its interpretation of § 18.2-250 "[g]iven the legacy of *Ritter* and the General Assembly's explicit inclusion of a knowledge requirement." *Id.* at 11. When it reheard the appeal en banc, the Court of Appeals of Virginia affirmed that holding. *Camann*, 896 S.E.2d at 377.

Taken together, these cases suggest that Virginia's interpretive process for determining whether an offense imposes strict liability is different from the one applied by the Supreme Court of the United States and the federal courts. Three differences are important here. The first difference is that the Supreme Court of Virginia does not automatically apply the presumption of scienter to statutes that do not specify a mental state element.[33] *Esteban*, 587 S.E.2d at 525–26. Second and related, Virginia courts appear to place greater weight than the federal courts on the absence of mental state language in statutes and regulations. *Esteban*, 587 S.E.2d at 526. Third, even statutes that impose significant maximum sentences are not automatically precluded from imposing strict criminal liability. *Id.*; *Maye*, 189 S.E.2d at 351.

---

[33] Even though the Court of Appeals in *Camann* held that Ritter "implicitly" recognized the presumption of scienter, it did so only where the statute at issue had previously been interpreted to include a mental state element and the text contained a knowledge or intent requirement. 2023 WL 2246635, at 9–11.

.

Reading *Esteban* alongside older cases like *Maye* and *Makarov* and considering the Court of Appeals of Virginia's analysis of strict liability issues, the Court will first look to the text of § 15-50-60 to determine if it contains any explicit mental state requirement. *See Esteban*, 587 S.E.2d at 525–26. If it does not, the Court will attempt to determine the purpose of the regulation and its associated statutory provisions, and if reading a mental state requirement into those statutes would detract from the regulation's purpose, the Court will find that the regulation imposes strict criminal liability. *Id.*; *Maye*, 189 S.E.2d at 351; *Makarov*, 228 S.E.2d at 575–76.

### 3. The Court finds that Title 4, Virginia Administrative Code § 15-50-60 imposes strict criminal liability.

The Court begins with the text of § 15-50-60: "It shall be unlawful to take or kill a female bear accompanied by a cub." [34] The chapter of the Virginia Administrative Code that contains § 15-50-60 is titled "Game: Bear" and includes other regulations related to bear hunting. 4 Va. Admin. Code §§ 15-50-60–15-50-120. Examining § 15-50-60 specifically, the plain language of the regulation says nothing about a mental state requirement, [35] so the Court takes this as evidence that the regulation does not include one. § 15-50-60; *Esteban*, 587 S.E.2d at 525–26; *Makarov*, 228 S.E.2d at 575–76.

The Court examines other regulations located within the same title of the Virginia Administrative Code to interpret the meaning of § 15-50-60. *See Indus. Dev. Auth. of City of Roanoke*, 559 S.E.2d at 623 ("[W]e read related statutes *in pari materia* in order to give, when

---

[34] The Virginia Board of Wildlife Resources promulgated the regulation. Virginia Code § 29.1-103 specifically allows the Board of Wildlife Resources ("the Board") to "adopt resolutions or regulations conferring upon the Director all such powers, authorities, and duties as the Board possesses and deems necessary or proper to carry out the purposes of this title."

[35] Black's Law defines the verb "Kill" as "[t]o end life; to cause physical death." *Kill*, Black's Law Dictionary (12th ed. 2024). This definition does not express an element of intent or mental state generally. *Id.*; *See CITGO Petroleum Corp.*, 801 F.3d at 477 (analyzing the definition of the term "take" as it appears in § 703 of the MBTA to limit the reach of strict criminal liability).

possible, consistent meaning to the language used by the general assembly."). Other regulations within the same title of the Virginia Administrative Code that create hunting and trapping offenses explicitly contain an intent requirement. *See* 4 Va. Admin. Code § 15-40-221 ("It shall be unlawful to intentionally set foothold traps, body-gripping traps, or snares within 50 feet of an animal carcass, or parts thereof, unless the carcass, or parts thereof, are completely covered at the time the trap is set or visited."); 4 Va. Admin. Code § 15-40-284 ("No person shall intentionally cripple or otherwise harm any game animal for the intent of continuing a hunt or chase, or for the purpose of training dogs."). The absence of such language in § 15-50-60 suggests that the Board deliberately omitted that language from § 15-50-60. *See Indus. Dev. Auth. of City of Roanoke.*, 559 S.E.2d at 623 ("[W]hen the General Assembly includes specific language in one section of an act, but omits that language from another section, we presume that the exclusion of the language was intentional.").

Determining whether a statute or regulation imposes strict liability requires a case-by-case approach that moves beyond the text to focus on the purpose of the statute or regulation. *Esteban*, 587 S.E.2d at 525–26. The Court is unable to find a substantial record of the regulation's promulgation—it appears to have been published for the first time in a newspaper in 1973. Richmond Times-Dispatch, April 19, 1973, at D-5. However, the Virginia Code specifically allows the Board to:

> promulgate regulations pertaining to the hunting, taking, capture, killing, possession, sale, purchase, and transportation of any wild bird, wild animal, or inland water fish, and the feeding of any game, game animals, or fur-bearing animals as defined in § 29.1-100, or the feeding of any wildlife that results in property damage, endangers any person or wildlife, or creates a public health concern.

Va. Code Ann. § 29.1-501. Section 15-50-60 cites Virginia Code § 29.1-501 as part of the statutory basis of its authority. Given this statutory mandate and the Board's promulgation of regulations

55

governing bear hunting generally, the Court finds that the regulation's purpose is to restrict the killing of female bears accompanied by a cub to achieve wildlife management goals. *See* Va. Code Ann. § 29.1-501; 4 Va. Admin. Code §§ 15-50-60–15-50-360. Reading a mental state element into this regulation would hinder the ability of the Board to regulate this aspect of bear hunting. Therefore, the Court declines to interpret § 15-50-60 as containing a mental state element.

Briefly mentioned in *Esteban* is the question of whether the statute or regulation merely adopts a common law crime. Blow points to no common law equivalent to § 15-50-60, and none is apparent to the Court. *See* ECF No. 10. Section 15-50-60 appears to create the type of regulatory offense that governs the taking of wildlife and game. *See supra* Section I.B.6.a. Therefore, the Court finds the fact that § 15-50-60 imposes a regulatory offense with no common-law equivalent weighs in favor of strict liability.

Finally, the Court looks to the penalty imposed by statute for a violation of § 15-50-60. Although the Court in *Esteban* rejected the Defendant's argument that all felonies implicitly include a mental state element, it did so because it held that the statute at issue did not incorporate a common-law crime. 587 S.E.2d at 525. Therefore, it is unclear from *Esteban* whether the length of a sentence factors into the Supreme Court of Virginia's strict liability analysis at all. *See Clayton*, 877 S.E.2d at 512 (Raphael, J. Concurring).

Even if it did, however, the potential sentence for an individual who kills a female bear accompanied by a cub is not so severe as to demand a strict liability interpretation. Virginia law classifies the unlawful killing of a bear as a Class 1 misdemeanor, imposing a maximum sentence of twelve months in prison, a fine up to $2,500, or both. Va. Code Ann. § 29.1-530.2. That penalty applies to "any person who kills or attempts to kill a bear in violation of any provision of this article or any regulation adopted thereunder." *Id.* It is unclear whether § 15-50-60 qualifies as a

56

"regulation adopted" under the article that contains Virginia Code § 29.1-530.2. Another nearby provision of the Virginia Code makes violating a regulation a Class 3 misdemeanor, which carries a maximum penalty of a $500 fine. § 29.1-505. The parties did not brief which penalty would apply to a violation of § 15-50-60, and the Court finds that it need not speculate about which penalty the Supreme Court of Virginia would apply. Both potential penalties are not severe enough to require a presumption of a mental state requirement. *Esteban* found that an offense imposing a maximum term of imprisonment of six years contained no mental state element. 587 S.E.2d at 526. Therefore, it seems unlikely that the Supreme Court of Virginia would hold that the penalty for violating § 15-50-60 demands that it be construed to include a mental state element.[36]

Virginia's interpretive approach to determining whether a criminal offense imposes strict liability may make it an "outlier" among the states. *Clayton*, 877 S.E.2d at 508 (Raphael, J., Concurring). But this Court must answer the question before it based on how it thinks the Supreme Court of Virginia would rule on the same question, and it arrives at its answer through the application of that court's precedent. *See Edwards*, 128 F.4th at 565. The Court concludes that the plain language of § 15-50-60, its apparent purpose, the fact that it does not integrate a common law crime, and the relatively low maximum sentence it imposes demonstrate that it imposes strict criminal liability for killing a female bear accompanied by a cub.

The Court's responsibility is "limited to interpreting, to the best of [its] ability," the regulation as it was promulgated. *Adams*, 426 F.3d at 733. "If the need exists for changes in the reach or clarity" of the regulation, the legislature of the Commonwealth or the Board may address that need. *Id.*

---

[36] Additionally, neither statute includes language suggesting that only intentional, knowing, reckless, or accidental killing of a bear may be penalized. *See* Va. Code Ann. §§ 29.1-505, 29.1-530.2.

**D. The Government only needs to prove beyond a reasonable doubt that Blow killed a female bear accompanied by a cub.**

Taken together, the analyses above demonstrate that to convict Blow of violating § 15-50-60, 50 C.F.R. § 32.2, and 16 U.S.C. § 668dd(f)(2), the Government only needed to prove beyond a reasonable doubt that Blow killed a bear, that the bear was female, and that it was accompanied by a cub. *See Freed*, 401 U.S. at 607–10. The Government did not need to prove that, when he killed the bear, Blow knew that the animal he killed was a bear, that the bear he killed was female, or that a cub accompanied the bear he killed. Nor did the Government need to prove that Blow acted in a way that recklessly or negligently disregarded the possibility that the bear was female or that a cub accompanied the bear.

## II.  **FINDINGS OF FACT**

On the Morning of October 31, 2024, Blow was hunting in the Moss Swamp area of the Great Dismal Swamp National Wildlife Refuge ("the Refuge"). The Great Dismal Swamp is part of the National Wildlife Refuge System located in the special maritime and territorial jurisdiction of the United States in the Eastern District of Virginia. Blow testified that he entered the Refuge that day to hunt deer, but he also had a permit to hunt black bear. *See* ECF No. 10, attach. 1. Blow testified that he began hunting in a tree stand in the refuge at sunrise. At approximately 8:30 a.m., Blow heard a noise, looked in the direction of the noise, and saw a black bear ("first bear") clambering down a tree ("the tree") about fifty yards from where he sat. Blow estimated that the first bear weighed about 150 pounds. He was excited when he saw the first bear, and in his judgment it was about thirty to forty feet from the ground. When the first bear reached the ground, it defecated. Blow placed the bear in the sites of his gun. Then, Blow testified that the first bear turned sideways to him, and he shot it. Blow testified that less than two minutes elapsed between when he first saw the first bear and when he shot it. The first bear ran.

Blow learned in a hunting class that bears typically run in a straight line from the spot at which they are shot.  So he walked to the base of the tree and opened an app on his cell phone that allowed him to draw a straight line from the spot where he shot the first bear to the direction in which it ran.  Blow found blood on the tree and a longer trail of blood extending in the direction in which the bear had fled.  He followed the blood trail for eighty yards before he found the first bear lying dead on the ground.

Blow "checked in" his kill [37]  and dragged the first bear's carcass back to the area where he shot it. Before he began to dress the first bear's carcass, he walked back to the base of the tree to mark it.  At that point, he noticed that there was another bear, "smaller than [the bear he] shot," resting on a branch in the tree ("second bear").  Blow testified that this was the first time he saw the second bear, and he did not see it move nor hear it make a sound until after he shot and killed the first bear.  Blow estimated that he saw the second bear for the first time about an hour after he shot the first bear.  Blow then gutted and field dressed the first bear and dragged it back to his truck.  He testified that he never saw the second bear climb down from the tree.  Blow drove out of the refuge.

Virginia Department of Wildlife Resources Conservation Police Officer Austin Wakefield testified that Blow called him at about 11:00 a.m. the same morning and stated he killed a female bear and discovered it was accompanied by a cub while hunting in the Refuge.  Officer Wakefield testified that he met with Blow and recorded their interaction with his cell phone.  The video showed Blow and Officer Wakefield discussing Blow's hunt earlier that morning, and Blow showed Officer Wakefield the remains of the first bear, which were in his truck.  Blow told Officer

---

[37] Officer Wakefield testified that Virginia law requires that if a hunter kills a bear, deer, or turkey, the hunter must log that kill through a specific online system so the state may track hunting data. *See* 4 Va. Admin. Code. §15-40-290 (requiring that hunters report the killing of a bear, deer, elk, or turkey "using the [Department of Wildlife Resources'] mobile harvest reporting application").

Wakefield that he estimated that the second bear appeared to weigh thirty to forty pounds. Officer Wakefield stated that the second bear may be in its second fall. Officer Wakefield testified that he contacted United States Fish and Wildlife Service Officer John Ross after Blow called him and then again after he met with Blow. Then, Officer Wakefield followed Blow back to the area of the Refuge where Blow shot the first bear.

The pair met Officer Ross in the Refuge. The Government played Officer Ross's body camera footage of their interaction at trial. In the video, Blow met Officers Ross and Wakefield on a road in the Refuge before taking them to the area of the Refuge where he shot the first bear. The group saw a small bear moving through the woods, though Officer Ross testified that it was unclear whether the small bear was the second bear. Then, Blow explained how he killed the first bear and spotted the second bear. Blow referred to the second bear as a cub, said that he did not intend to shoot a bear with a cub. Eventually, the group began to walk back toward Blow's truck. Officer Ross testified that he saw blood at the base of the tree by a bullet hole. Officer Ross testified that he estimated that Blow was about 50 yards away from the tree when he shot the first bear.

The Government also elicited testimony from Officers Wakefield and Ross about bears and bear hunting regulations in Virginia. The Government submitted, as an exhibit, a page from the Virginia Department of Wildlife Resources bear hunting webpage. ECF No. 8, attach. 1 at 1. The Government asked Officer Ross about the following provision, titled "Bag Limits": "One per license year, at least 100 pounds live weight or 75 pounds dressed weight (all internal organs removed). Females with cubs may not be harvested. Cubs may be 30–50 lbs by fall. Please observe and be patient before shooting as cubs often lag behind the female." *Id.* Officer Ross testified that Blow told him that he had read that provision of the webpage. On cross-examination,

Officer Ross testified that he understands a bear's classification as a cub to be based on weight, not age. Officer Wakefield, on the other hand, testified that he had no first-hand knowledge of whether cubs should be classified by weight or age, but testified that he believed that bear is a cub when it is less than one year old.

Blow also testified that he hunted as a child, stopped when he was about eighteen years old, and then began hunting again approximately four years ago. Blow testified that he completed computer training and attended a weekend bear hunting course offered by the Virginia Department of Wildlife Resources in Appomattox. Blow testified that, during a different hunt before he shot the first bear, he had spotted another bear in the swamp ("other bear"). He could have harvested the other bear at that time, but he did not shoot it because the other bear was moving away from him and he did not have a good shot.

### III. VERDICT

The Court **FINDS** that the Government proved beyond a reasonable doubt that Blow killed a female bear accompanied by a cub in violation of Title 4, Virginia Administrative Code § 15-50-60. First, the Court finds that the Government proved that Blow killed a female bear. 4 Va. Admin. Code § 15-50-60. At trial, Blow did not dispute that he killed the first bear, but he argued that the Government had not established beyond a reasonable doubt that the bear was female. According to Officer Wakefield's testimony, when Blow first called Officer Wakefield after leaving the refuge, Blow himself stated that he had shot and killed a female bear. The Court **FINDS** that Blow's admission to Officer Wakefield of the bear's sex, the presence of a cub in the same tree as the first bear, and the absence any other contradictory evidence, established beyond a reasonable doubt that the bear Blow killed was female.

Next, the Government proved beyond a reasonable doubt that the female bear—the first bear—was accompanied by the second bear.  § 15-50-60.  Blow argued at trial that, in the time it took him to drag the first bear's carcass back to the tree from where the first bear had died, the second bear could have climbed the tree on its own.  In other words, Blow argues that the Government has not shown that the bears accompanied one another, or that there was any connection between the two bears.

The verb "accompany" is defined as "[t]o go along with (another); to attend." *Accompany*, Black's Law Dictionary (12th ed. 2024).  Blow's testimony indicates that he spotted the second bear in the same tree from which the first bear had descended, which was marked with the first bear's blood and a bullet hole, about an hour after he shot the first bear.  Blow testified that he did not see the second bear in the tree before he shot the first bear.  But Blow had been hunting for some significant period of time—between sunrise and 8:30 a.m.—by the time he shot the first bear, and he testified that he failed to see the first bear until it climbed down the tree.  The Court **FINDS** that, through this testimony, the Government established beyond a reasonable doubt that the second bear accompanied the first bear.

Finally, the Government proved beyond a reasonable doubt that the second bear was a cub. § 15-50-60.  Blow argued that there is no codified definition of the term "bear cub" in Virginia and emphasized that officers Wakefield and Ross were unable to define with certainty what makes a bear a cub.  But in the body camera footage proffered by the Government, Blow refers to the second bear as a cub.  And as the Department of Wildlife Resources bear hunting webpage indicates, a cub may be thirty to fifty pounds by the fall.  ECF No. 8, attach. 1 at 1.  Blow told Officer Wakefield that he believed the second bear to weigh thirty to forty pounds when he first

saw it.  Consequently, the Court **FINDS** that the Government proved beyond a reasonable doubt that the second bear was a cub.

### IV. <u>CONCLUSION</u>

The Government has proven each element listed in Title 4, Virginia Administrative Code § 15-50-60 beyond a reasonable doubt, so the Court **FINDS** Blow **GUILTY** of violating that regulation.  Consequently, the Court finds Blow **GUILTY** of violating an applicable state regulation in violation of 50 C.F.R. § 32.2(d) and 16 U.S.C. § 668dd(f)(2).  Pursuant to Fed. R. Crim. P. 32(j)(1), the Defendant has the right to appeal his conviction and sentence.  To do so, he must file a notice of appeal within fourteen days.

The Clerk is **DIRECTED** to forward this Order to all counsel of record.

It is so **ORDERED**.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
June 17, 2025